THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: **0:25-cv-60645-AHS**

0

**TIKTOK GLOBAL LLC**,
a Florida limited liability company;

        Plaintiff,

v.

**BYTEDANCE LTD.**, **TIKTOK INC.**, and
**YIMING ZHANG**,

        Defendants.

_____/

## FIRST AMENDED COMPLAINT

Plaintiff, TIKTOK GLOBAL LLC, by and through undersigned counsel, hereby files this First Amended Complaint against Defendants, BYTEDANCE LTD., BEIJING BYTE DANCE TELECOMMUNICATIONS CO. LTD., TIKTOK INC., and YIMING ZHANG, and alleges as follows:

### INTRODUCTION

1.     In the ever-evolving landscape of social media, few platforms have captured the world's attention quite like TikTok. With its addictive short-form videos and algorithm-driven content delivery, the Chinese-owned app quickly became a global phenomenon, amassing over 170 million users in the United States and more than one billion worldwide.

2.     However, its meteoric rise was not without controversy, particularly in America, where concerns about data privacy and national security began to mount. These concerns culminated in the recent Supreme Court decision in TikTok Inc. v. Garland, 604 U.S. ___ (2025), which upheld the constitutionality of the Protecting Americans from Foreign Adversary Controlled Applications Act ("the Act"), effectively banning TikTok in the United

1

States unless its U.S. operations were severed from Chinese control.

3.     As 2020 unfolded, these concerns reached a fever pitch. The Trump administration, citing national security risks, issued an executive order that would effectively ban TikTok in the United States unless its Chinese parent company, ByteDance, divested its U.S. operations to an American company.

4.     Enter Plaintiff TikTok Global LLC ("TG" or "Plaintiff"), a group of American investors who saw an opportunity not just for profit, but to address the national security concerns head-on by acquiring TikTok's U.S. operations and severing them from Chinese control.

5.     This set the stage for what should have been a straightforward process of acquisition and divestment, but instead, it became a twisted tale of corporate intrigue, conspiracy, and antitrust violations that continues to this day.

6.     Plaintiff would soon discover that the game was rigged from the start because Beijing Telecomm and ByteDance had other plans, plans that circumvented proper procedures, stifled competition, and maintained their control over TikTok's U.S. operations – all under the guise of E.O. compliance.

7.     This action arises from Defendants Beijing Byte Dance Telecommunications Co. Ltd. ("Beijing Telecom"), ByteDance Ltd ("ByteDance"), its subsidiary TikTok Inc. ("TikTok"), and ByteDance CEO in 2020, Defendant Zhang's course of conduct to:

   i. Reject compliance with U.S. data and privacy laws at both the State and Federal levels for years.

   ii. Delay and ignore remedial and safety investments in their U.S. subsidiary internet app company, putting users at increased risk compared to if the video app was owned by U.S. majority investors in a U.S. Corporation required to comply with State and

Federal laws.

iii. Make false claims to the U.S. public and government through media appearances and lobbying efforts, spending millions of dollars to influence U.S. politicians to take no action in enforcing recently passed laws aimed at eliminating National Security Threats.

iv. Potentially harvest U.S. user data, as evidenced by recent revelations of similar practices in the EU, resulting in a 530 million Euro fine for harvesting EU children's data and secretly exporting it to China.

v. Damage Plaintiff's property and interfere with legal rights created through timely, accurate, and complete Committee on Foreign Investment in the United States ("CFIUS") certification.

vi. Orchestrate an overarching conspiracy between 2019 and the present to manipulate and maintain leadership positions in the U.S. online video and social networking markets through:

> a. Illegal agreements
>
> b. Bid rigging
>
> c. Operation of a criminal enterprise known as the "Z-BOT RICO Enterprise"
>
> d. Market manipulation tactics
>
> e. Anticompetitive practices (ByteDance - BEIJING BYTE DANCE TELECOMMUNICATIONS CO. LTD.- Oracle – TikTok - Zhang- Covington & Burlington - GD Culture Group) The Z-BOT RICO Enterprise

8. The Z-BOT RICO Enterprise was formed in 2019 during anxiety-fraught meetings

where Chinese executives conspired with American cloud server providers to undermine any U.S. legal ban requiring ByteDance to divest its TikTok subsidiary to American majority ownership.

9. At the center of the conspiracy was the unlawful manipulation of CFIUS, enabled by secret agreements between technology companies and facilitated through meetings where illegal deals were negotiated.

10. The intrigue deepened when Plaintiff's TikTok Global brand IP was misappropriated to mislead the public during a live CNBC broadcast, while Plaintiff's pending CFIUS certification and timely executable acquisition agreement was suppressed.

11. By orchestrating these charades, ByteDance continues to maintain their grip on TikTok by erecting insurmountable barriers to entry, stifling any legitimate acquisition offers that dare challenge their dominion.

12. The U.S. Supreme Court, in TikTok Inc. v. Garland, 604 U.S. (2025), upheld a law prohibiting U.S. companies from providing services to TikTok unless U.S. operation of the platform is severed from Chinese control, ruling that it did not violate the First Amendment.

13. With TikTok effectively banned in the United States unless divested from Chinese control, Defendants face a stark choice: divest TikTok's U.S. operations to a qualified American buyer or cease operations in the United States entirely. Plaintiff stands ready, as it has since 2020, to acquire TikTok's U.S. operations and fulfill the requirements of the Act, ensuring that millions of Americans can continue to use the platform while addressing legitimate national security concerns.

## PARTIES

14.     Plaintiff, TIKTOK GLOBAL LLC ('TG'), is a Florida limited liability company, organized under the laws of Florida, and successor to Arkansas based, Tiktok Global Network Inc. ("TGN"), and Delaware incorporated Tiktok Global Inc. ("TGI"). TG's

members are citizens of New York.

15.     Defendant, TIKTOK INC. ("TikTok"), manages Tiktok.com, a popular social media platform and is a California corporation with its principal place of business in Los Angeles.

16.     Defendant, BYTEDANCE LTD. ('ByteDance'), is a private company with operations and principal place of business in China.

17      Defendant, BEIJING BYTE DANCE TELECOMMUNICATIONS CO. LTD., Beijing Telecommunications") or ('BT') a private company with operations and principal place of business in China.  Beijing Telecommunications. Bytedance,  and Tiktok, are foreign entities under CFIUS 800.220(a) and under CFIUS regulations, 31 C.F.R.§ 800.220(a).

18.     Defendant, YIMING ZHANG, at all relevant times the CEO of ByteDance and a Chinese citizen.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 as this action arises under federal law, specifically the Sherman Antitrust Act, 15 U.S.C. § 1 et seq. the Clayton Act (15 U.S.C. §§ 15, 26), and RICO (18 U.S.C. §§ 1961-1968). This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) as a substantial part of the events giving rise to the claims occurred in this district.

## FACTUAL ALLEGATIONS

20.     The Committee on Foreign Investment in the United States ("CFIUS") published final rules on January 17, 2020, to implement (FIRRMA)

21.     On August 6, 2020, President Trump issued an executive order addressing the "Threat Posed by TikTok" (the "August 6 EO"), prohibiting any transactions by U.S. persons

with ByteDance Ltd., within 45 days.[1]

22.     On August 14, 2020, President Trump issued Order Regarding the Acquisition of Musical.ly by ByteDance Ltd. ("Aug. 14 EO"), ordering ByteDance to divest, within 90 days, from the assets and data that TikTok had gathered in the United States.

23.     ByteDance falls within the purview of CFIUS because of its 2017 acquisition of lip-sync app Musical.ly, which ByteDance later merged into TikTok to create a single integrated social media application.

24.     ByteDance did not submit an application for CIFUS review at the time of the acquisition, but CFIUS retroactively reviewed the acquisition and unanimously recommended divestiture to the President.

25.     TikTok and ByteDance filed a lawsuit on August 24 before the U.S. District Court for the Central District of California challenging the Aug. 6 EO as unconstitutional and ultra vires, and sought a court injunction against the order.

26.     The August 14 EO also established specific procedures under Section 2(d), requiring that: (i) parties to a transaction notify CFIUS in writing of any intended buyer, and (ii) allow 10 business days for CFIUS review before completing any sale.[2]

27.     These procedures were designed to ensure that any divestiture of TikTok's U.S. operations would address national security concerns and result in a complete transfer of

---

[1] The E.O. justifies its action by referencing TikTok's alleged threats to U.S. national security through data collection, content censorship, and misinformation campaigns.

[2] CFIUS three-step process for evaluating proposed or pending investments (1) a 30-day declaration filing; (2) a 45-day national security review (from 30 days), including an expanded time limit for analysis by the Director of National Intelligence (from 20 to 30 days); (3) a 45-day national security investigation, with an option for a 15-day extension for "extraordinary circumstances"; and a 15-day presidential determination.

ownership and control to a U.S. entity.

### Advantage #1 Successful Contact With TikTok CEO In August 2020

28.     The Plaintiff successfully contacted the TikTok CEO, Kevin Mayer, during the month of August 2020 to inform ByteDance of the interest in providing a divestiture solution for the ban its TikTok subsidiary was subject to.

### Advantage #2: TikTok's CEO Already Knew Plaintiff's CEO

29.     During these communications, Kevin Mayer confirmed he remembered the Plaintiff's CEO from a 2001 transaction between the concert and music company, SFX where Mayer was a senior executive and eUniverse, Inc. a public Internet company where the Plaintiff's CEO was executive Chairman at the time. [3]

30.     Before TikTok's CEO Kevin Mayer is able to meet to have more detailed discussions with the predecessor of the Plaintiff, Mayer unexpectedly resigns as CEO on August 27, 2024.[4]

### Advantage #3: First To Incorporate TikTok Global



31.     On September 6, 2020, Plaintiff TikTok Global  incorporated as a strategic CFIUS divestment solution whose purpose was to acquire ByteDance's TikTok U.S. operations. A few months before, the Plaintiff's CEO had decided to create a solution for the U.S. Government's long complained about clear problem. A forced sale of a Chinese owned asset.

32.     Next, the Plaintiff acquired and launched corporate website Tiktokglobalnetwork.com with private email to use communications with ByteDance, Tiktok, CFIUS, investors, and news media.

**Plaintiff Predecessor Pre-TG Incorporation Contact With TikTok CEO**

33.     As a result of Kevin Mayer resigning as TikTok CEO, the Plaintiff had lost its key contact and therefore began communicating with different ByteDance executives by email and LinkedIn messages to inform them of the Plaintiff's impending intent to acquire its TikTok U.S. property, and why it would be beneficial for the defendants.

34.      The Plaintiff explained its acquisition was strategic because it planned to contribute additional online video assets and IP it owned or controlled merging them  as part of the CFIUS divestment transaction.

35.     The Plaintiff's predecessor spent a significant amount of time and effort to create a proprietary strategy that would benefit or put ByteDance in the best position possible while complying with the ordered ban. For instance, the Plaintiff provided ByteDance with the strategic guide.

36.     Another reason the Plaintiff invested significant time and effort in this endeavor is that the Plaintiff had an expectation after applying for CFIUS certification its name, brand, and unique "TikTok Global" divestment strategy would be protected from being misappropriated.




**Beijing Byte Dance Telecommunications Co. Ltd.,**

**'BBT'**

WHY WHITE KNIGHT WANT HELP?

#1 – The White Knight was a CEO of high profile internet company many years Ago and had tough challenges to get thru. When the White Knight became Aware of ByteDance CEO's challenging tim
Knight saw a strategy To help and the White Knight wanted to get involved in an exciting fast moving Story and feel good if he could make positive difference to help a fellow Entrepreneur like Mr. Y

#2 – The White Knight owns part of an exciting EU mobile video website with 20 million monthly users. The site needs some growth/expansion funding. Because
ByteDance as part of its business strategy makes investments into mobile video  Websites, The WhiteKnight realized that he could give ByteDance exclusive
Right to terminate the acquisition agreements at any time and on no notice  which Was critical for ByteDance to be able to do and control because otherwise
ByteDance outside VC would not want ByteDance to be in situation where ByteDance coudnt get higher offer from Oracle after China Export license
Granted, so ByteDance needs this flexibility as part of the agreements. WhiteKnight Buyer, TikTok Global Network (TGN) agreed to this knowing it likely that
It would get terminated if Oracle really wanted to own TikTok in future. So a $25,000,000 investment will be made into the mobile video EU website
To help it expand if a terminated agreement is decided by ByteDance. And ByteDance gets stock at cheap valuation in the EU mobile video site, & a $10,000,000 extra
Prepaid ad credit to use in future. So ByteDance effectively does not have To pay lots of cash as with a normal termination fee  (which in all cases
The Termination fee payor would get no stock or no ad credits an dit would be a LOSS/EXPENSE of significant amount which is not enjoyable. But in White
Knight deal, ByteDance has that burden removed by good karma/luck that WhiteKnight controls mobile video superstar up and coming startup In EU!!!

### Sep 9 Joint CFIUS Certification Submission

37.    On September 9, 2020, Plaintiff properly submitted notice to CFIUS under

Section 2(d)(i) of its intent to bid for TikTok's U.S. operations. (**Ex. 1**).[5]

September 9, 2020

ATTN: CFIUS
Cc: Mr. Yiming Zhang, CEO ByteDance Ltd

Under Sec. 2.(d)(i),  In regards to the U.S. Presidential E.O. Issued on: August 14, 2020
Under section 721 of the Defense Production Act of 1950, as amended (section 721), 50 U.S.C. 4565
Order Regarding the Acquisition of Musical.ly by ByteDance Ltd

Sec. 2.  Actions Ordered
(d)  ByteDance shall not complete a sale or transfer under section 2(b) to any third party:
(i)   until ByteDance notifies CFIUS in writing of the intended recipient or buyer; and
(ii)  unless 10 business days have passed from the notification in section 2(d)(i) and CFIUS has not issued an objection to
ByteDance.  Among the factors CFIUS may consider in reviewing the proposed sale or transfer are whether the buyer or
transferee: is a U.S. citizen or is owned by U.S. citizens; has or has had a direct or indirect contractual, financial, familial,
employment, or other close and continuous relationship with ByteDance, or its officers, employees, or shareholders; and
can demonstrate a willingness and ability to support compliance with this order.

Under Sec. 2.(d)(i), intended recipient or buyer:

TikTok Global Network Inc
244 Fifth Avenue,
Suite #g290
New York, NY 10001
bgreenspan@tiktokglobalnetwork.com

---

[5] § 800.236(a)(9) makes clear that any party that submitted a declaration or notice to the
Committee regarding a transaction is a party to the transaction. Further under 800.236(b), a
party to a transaction includes any affiliate of any party described under (a)(9).

Brad Greenspan
244 Fifth Avenue,
Suite #g290
New York, NY 10001

Per Sec. 2(e)  ByteDance will provide specific details of the  TikTok Global Network Inc   transaction if still applicable under "description of efforts to divest the interests and rights described in section 2(b) and a timeline for projected competion of remaining actions" in next "Weekly basis"   required under Sec . 2€ to "certify to CFIUS"

(e)  From the date of this order until ByteDance provides a certification of divestment to CFIUS pursuant to section 2(b), ByteDance and TikTok Inc., a Delaware corporation, shall certify to CFIUS on a weekly basis that they are in compliance with this order and include a description of efforts to divest the interests and rights described in section 2(b) and a timeline for projected completion of remaining actions.
include a description of efforts to divest the interests and rights described in section 2(b) and a timeline for projected completion of remaining actions.

Sec. 2(d)(ii) factors CFIUS may consider in reviewing the proposed sale or transfer are (See Exhibit A)

Regards,

Brad Greenspan
President/CEO
TikTok Global Network Inc
244 Fifth Avenue, Suite #g290
New York, NY 10001

38.    The CFIUS submission as required under § 800.401 was concurrently provided to Beijing Telecomm CEO, Defendant Zhang and head of Public Relations and Global Media, by email.

**Plaintiff's Management Leadership and Qualifications**

39.    Plaintiff believed it had a significant advantage as a result of the caliber of management it recruited to participate in the CFIUS certification process and operate the post-acquired TikTok U.S. assets.

40.    The chief executive of TikTok Global LLC is the same seasoned internet veteran who led TikTok's predecessor in 2020, Brad Greenspan. Greenspan, with his extensive background in social media and online video technology, arguably possessed the most qualified experience among Americans to manage a divested TikTok U.S. platform in 2020.

41.    At just 27, Greenspan founded a public company that grew to become the eighth largest U.S. website property and turned cash flow positive by the end of 2001. As Chairman/CEO of eUniverse, Inc., he expanded its online audience from 1 million users in 1999 to over 49 million by 2001.

42.    After the dot-com bubble burst in 2001, serving as Chairman/CEO of

Myspace.com's parent company, eUniverse underwent significant restructuring.

43.     This included discontinuing its online music CD ecommerce division and launching new online content and community business units, which boosted revenue from $1.8 million in fiscal year 2000 to $16 million in fiscal year 2001, reaching cash flow positivity, and then growing to $33 million in fiscal year 2002 and $66 million by fiscal year 2003.

44.     A 2001 Gartner Report credited Greenspan with developing a unique proprietary "Secret Successful" methodology for Internet ad sales—a process that has since evolved into the performance-based advertising model used in over 90% of all online ad purchases annually.

45.     Greenspan was also a pioneer innovating a social network in the Metaverse, receiving the first trademark for his LivePlace product on July 4, 2000, with a description that encompassed many of the traits now associated with what the industry calls the metaverse. The head developer of LivePlace went on to create hugely popular PokemonGo mobile game.

46.     Only American to create three different websites that topped their respective categories. The last Myspace.com, a fully owned social network was launched August 2003 and overtook first mover Silicon Valley based Friendster to became the leading social network by February 2004.

47.     At the close of 2005, eUniverse and Myspace were sold for $650 million in cash by News Corporation which was all time high stock price cashing out over 100 institutional investors.

48.     Displaying his acumen further, Greenspan rolled out BroadWebAsia, acquiring controlling stakes in several Chinese video websites and constructing a network

that lured over 60 million unique visitors per month across China.

49.    His victories caught the attention of Major League Baseball (MLB), which picked him to spearhead an international joint venture creating and operating MLB's first official website in China.

50.    His venture culminated in securing an exclusive license from MLB's Advanced Media to launch MLB.cn in 2008—the first American-controlled Chinese company to obtain an online video streaming license from the People's Republic of China.

51.    Greenspan's experience in Singapore, where ByteDance runs a significant portion  of TikTok U.S., provides him with valuable connections that would have benefit post-acquisition operations.[6]

52.    Additionally, Greenspan's pioneering efforts in livestreaming and online video— evidenced by his launch of the innovative LiveVideo.com video social network in 2007 and his  role as co-founder of the video news site Liveleak.com—further bolstered his qualifications to expand and manage TikTok U.S.

## THE Z-BOT RICO ENTERPRISE

53.    Defendants in 2020 solicited and made secret plans with the founding members of the Z-BOT associated in fact enterprise: Beijing Telecom, ByteDance LTD, CEO Zhang, TikTok, Inc. (all Chinese based), and radically expanded the enterprise with U.S. cloud provider Oracle Corp, Covington & Burlington, and Sayonara LLC[1]. Plaintiff seeks

_____

[6]   In 2010, Greenspan was recruited by the Singapore Government and awarded an incubator fund in partnership with Singapore's National Research Foundation (NRF), subsequently operating a Singapore based incubator and making investments in Singapore digital media startups that contributed to the growth of Singapore's now thriving digital innovation ecosystem.

injunctive relief to compel defendants to cease and desist from: i. Further racketeering acts described herein ii. Preventing further harm to millions of U.S. citizen users victimized by the banned app iii. Violating the Defend Trade Secrets Act of 2016 (18 U.S.C. § 1836) iv. Violating the Racketeer Influenced and Corrupt Organizations Act (RICO) (18 U.S.C. §§ 1962(a), (b), (c)) v. Violating 15 U.S. Code § 1 vi. Unjust enrichment vii. Tortious interference

54. Defendants have used an association-in-fact "enterprise," within the meaning of 18 U.S.C. 1961(4), to carry out their pattern of racketeering activity.

55. Each Defendant qualifies as a "person" under the civil RICO statute, knowingly and fraudulently conducting and participating in the Z-Bot Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

56. Defendants engaged in unlawful activities such as interstate mail and wire fraud, which is illegal under RICO, even though pursuit of profit is not per se violative of these statutes.

57. The Z-Bot Enterprise possesses: i. A common purpose and goal; ii. A membership; iii. Organizational structure; iv. Ongoing relationships between Beijing Telecom and ByteDance Ltd; v. Sufficient longevity to permit and enable pursuit of its purpose and long-term objectives; vi. A continuous course of conduct affecting interstate and foreign commerce.

58.     Defendants violated RICO and injured Plaintiff and millions of U.S. citizens and their businesses or property through their conduct of the Z-BOT-Enterprise's unlawful activities to maximize gain and profit.

59. Defendants and the Z-Bot RICO Enterprise's course of conduct includes: i. Concealment of systematic decisions placing financial goals above safety considerations; ii. Activities conducted in violation of applicable laws and regulations; iii. Perpetrating tax fraud; iv. Trade secret theft; v. Wire fraud; vi. Mail fraud; vii. Perjury; viii. Forgery; ix. Theft; and

misappropriation of trade secrets and intellectual property (IP).

60.     Since 2020, Defendants have used the Z-Bot RICO Enterprise to conduct numerous interrelated criminal acts affecting trade or commerce.

61. Defendants and the Z-Bot RICO Enterprise engaged in a fraudulent scheme to harvest U.S. consumer data and transfer it to China for economic and political reasons.

62. Defendants and the Z-Bot RICO Enterprise also engaged in identifying and securing large online audiences to monetize through advertising, premium services, or p2p marketplace fees.

63.     For the purpose of devising and carrying out their scheme and artifice to defraud government regulators and Plaintiff and other victims by means of false or fraudulent pretenses, pretentions and promises, Defendants did place in an authorized depository for mail, or did deposit or cause to be deposited with private commercial interstate carriers and knowingly caused to be delivered by the United States postal service, letters, memoranda, and other matters, in violation of 18 U.S.C.§ 1341, or aided and abetted in such criminal acts, as previously described, under 18 U.S.C. § 2.

64.     Defendants' alleged RICO predicate acts in furtherance of their scheme to defraud governmental regulators constituted a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) due to the predicate acts being of a related and continuous.

65.     Each predicate act had the same or similar purpose: the predicate acts involved material misrepresentations, omissions and concealment in a scheme to deceive consumers or the Plaintiff and defraud the regulators into believing Defendants were conducting their operations legally.

66.     Included in these predicate acts are those situations where defendants communicated by mail, interstate wire or interstate carrier in order to obtain various required governmental approvals for Defendants' activities.

67.     RICO Defendants engaged in retaliatory acts against Plaintiff, charged unlawful interest rate debt, all of which constitute a pattern of racketeering activity under § 1962(c).

68.     All of the aforementioned predicate acts are interrelated and continuous parts of the scheme of Defendants' Enterprise to defraud regulators and Plaintiff along with other victims. Continuity is demonstrated due to the predicate acts forming a pattern of racketeering stretching over many years.

69.     As a proximate result of the pattern of racketeering activity and RICO violations engaged in by Defendants, Plaintiff has suffered injury to its business and property.[7]

70.     Plaintiff seeks to prohibit the RICO Defendants from utilizing the pattern of unlawful conduct in which they have continually engaged during the relevant time period.

71.     The pattern of the RICO Defendants' illegal racketeering activity includes: i. Instances of mail fraud (18 U.S.C. § 1341) ii. Instances of wire fraud (18 U.S.C. § 1343) iii. Instances of destruction, alteration, or falsification (18 U.S.C. § 1519) iv. Instances of computer fraud (18 U.S.C. § 1832)

72.     As a result of the defendants' violation of the RICO statue including predicate act involving 18 U.S.C. § 1832, 201 Plaintiff's property has been harmed and damaged.

73.     The loss of Plaintiff's 2020 brand by misappropriation during a CNBC financial news segment in September 2020 caused both TikTok Global Network and TikTok Global Inc. to begin having the value drained out of them and on March 1, 2022, Delaware based TikTok Global Inc. was forced to shutter as an active corporation.

_____

[7] Plaintiff's CEO previously agreed to transfer to the Plaintiff, all rights and claims for damages he possesses under the RICO statue and Sherman Act.

74.     In addition, Defendants' violations of RICO statute's 18 U.S.C. § 1832 predicate act misappropriated Plaintiff's trade secrets, M&A strategy IP provided in pdf formats, Plaintiff's public market spin off trade secrets for the benefit of Beijing Telecom, ByteDance, and the Z-BOT Enterprise, causing IconV's IP to be harmed as a result of such IP becoming greatly diluted, diminished, and lost.

75.     Plaintiff's property, specifically the interest in the divested assets of Defendant ByteDance and Beijing Telecomm, and was damaged by reason of the violation of section 1962.

76.     Plaintiff's business was harmed by reason of the violation of § 1962 as a result of not being able to get the benefit of the bargain owed for submitting the CFIUS certifications and notifications.

77. Each defendant is liable for 100% of the damages Plaintiff, its business, and property has suffered, and were fully aware of the damages that would be caused.

**Plaintiff Submits Its Sep 14 CFIUS Compliant Transaction**

78.     On September 14, 2020, at 5:04 AM, with clear evidence of its genuine intent, Plaintiff notified CFIUS, ByteDance, and Zhang that TG had provided ByteDance with an executable Asset Purchase Agreement for $33.3 billion designed to fully transfer ownership and control of TikTok's U.S. operations to an American company to allay the national security concerns that had led to the Executive Order. (**Ex. 2**).

79.     The Asset Purchase Agreement was a comprehensive, legally binding 50+ page document that addressed all aspects of the proposed transaction, including the purchase price, assets to be acquired, liabilities to be assumed, and transition services.

80.     The agreement was structured to ensure full compliance with the August 14 EO and CFIUS requirements. It also provided significant background on the Plaintiff to help the

defendants realize why they were going to be putting TikTok in good hands with a very skilled experienced operator, the Myspace.com Founder, if they moved forward with the TG transaction.

81.     Zhang and Bytedance forwarded the "White Knight" strategy guide provided by the top U.S. expert to Oracle Corp, and induced Safra Cafa to not respond to the Plaintiff's new business development email introduction letter sent to Oracle by Plaintiff's predecessor on September 14, 2020.



82.     Oracle joined the conspiracy no later than September 14, 2020 when it forwarded the confidential email and business proposal and licensing request received from Plaintiff predecessor TikTok Global incorporated.



83.     Oracle, a member of Bot-Z RICO Enterprise, committed a violation of 18 U.S.C. § 1341 and/or § 1343 containing false information and facts by interstate wire or interstate carrier. This fraudulent inducement falsely claimed that the writing had the approval or authorization from Plaintiff.

84.     ByteDance and Zhang, along with their public relations head who was cc'd on the email, wrongly appropriated "TikTok Global", a separate predicate act violation of 1831(a)(5),(1).

85.     Based on credible information and belief, defendant Beijing Telecomm directed ByteDance and other Z-BOT members to take over the "TikTok Global" brand under false pretenses. These actions were in direct violation of § 1832, involving BOT-Z RICO Enterprise.

86.   Defendants which include Z-Bot, Tiktok, Zhang, ByteDance, Oracle, Covington & Burling conspired in violation of 18 U.S.C. Code § 1832(5) on or about September 20, 2020. Their offense? Converting TG's trade secrets related to Divestiture, CFIUS, and public M&A for Z-Bot's benefit despite knowing it would inflict damage upon the Plaintiff.

87.     Mnuchin covertly aligned with Z-Bot despite his contractually obligated responsibility to offer equal rights to the Plaintiff.

88.     The formidable Z-BOT Enterprise and its members manipulated their control of Z-Bot, LLC to perpetrate wire fraud (18 U.S.C. § 1343), a scheme that began on January 15, 2015 and continued until no later than October 2019.

89.     The Defendants may have violated 18 U.S.C. § 1512 (c). Their crime? Scheming to conceal actual facts behind the legal cases they cited in their Motion To Dismiss the initial complaint. They sought to "impair" the "integrity" of the Plaintiff's credibility, and did so to exert influence over an official proceeding which happens to be U.S. District Court

Case 25-cv-60645 in SDNY.

<strong>The Sham Partnership and Conspiracy</strong>

91.     In the intricate dance of corporate maneuvers, ByteDance was poised to gracefully advance to the next step, finalizing the intricate deal architected by the Plaintiff that satisfied the demands of CFIUS.

92.     Despite the Plaintiff being the only interested buyer to strictly follow all CFIUS procedures—and having transmitted a fully executable acquisition agreement at 5:04 AM—at around 9:00 AM EST on September 14, 2020, Treasury Secretary Mnuchin appeared on CNBC and announced that Oracle had been selected as the ""trusted technology partner"" for TikTok's U.S. operations.

93.     Then, in a move as unexpected as a twist in a dramatic ballet, Mnuchin sprang into the debate and unveiled his own version of "TikTok Global." In a calculated strategy that seemed designed to outmaneuver CFIUS, he declared matter-of-factly, that he had received a commitment "TO MAKE TIKTOK GLOBAL AS A U.S. HEADQUARTERED COMPANY WITH 20,000 NEW JOBS."  (Ex. 3).

94.     The CFIUS approval deadline had passed as of September 14, 2020, placing the Plaintiff in an extremely advantageous position.

95.     However, before the Plaintiff could introduce   itself to the public and discuss its $33 billion acquisition agreement, its novel branding strategy   was misappropriated, abruptly usurped and paraded on national television as if it belonged to another.

<strong>PLAINTIFF'S EXECUTED 51 PAGE ACQUISITION<br>AGREEMENT WAS USED AS A BACKUP BY THE Z-BOT RICO Enterprise.</strong>

96.     Oracle became a member of Bot-Z RICO Enterprise and violated 1341 and 1343 by providing false information and facts through interstate wire or carrier, which was a

19

violation of 18 U.S.C. § 1341 and/or § 1343, as it fraudulently induced/falsely claimed the writing had been approved or authorized by Plaintiff.

97.     ByteDance and Zhang or their public relations head wrongly appropriated "TikTok Global," which is a separate predicate act violation of 1831(a)(5),(1).

98.     Plaintiff's trade secrets included its proprietary 51-page acquisition agreement, divestiture strategy, and strategy briefings they contributed and gave to ByteDance, TikTok, and Zhang.

99.     Beijing Telecom was directing its affiliates and subsidiaries like ByteDance to push down an alternative path that sidestepped the strict requirements of FIRRMA, offering a sophisticated partnership to surveil and recover mass American data, further bolstered by cloud storage with tech giants Oracle and Microsoft, and retailer Walmart.

100.    Mnuchin's deceptive portrayal on CNBC on September 14 caused confusion within CFIUS about the earlier "TikTok Global" submissions from the Plaintiff and introduced a completely different version of "TikTok Global" to the public.

101.    The Z-Bot RICO Enterprise's September 14, 2020 predicate act violated 8 U.S. Code § 1831(a) because the defendants and Steve Mnuchen intended and knew the "offense will benefit" a "foreign government, foreign instrumentality, or foreign agent," which was China PRC.

102.    The Z-Bot RICO violated 8 U.S. Code § 1831(a)(5) because Z-BOT's Steven Mnuchen conspired with at least one other member to appropriate Plaintiff's brand and trade secrets.

103.    The Z-Bot RICO violated 8 U.S. Code § 1831(a)(2) because Zhang, ByteDance, and TikTok transmitted, delivered, sent, or conveyed Plaintiff's trade secrets, including the CFIUS certification, to Oracle and Covington & Burlington without authorization.

104.    The Z-Bot RICO violated 8 U.S. Code § 1831(a)(3) on September 14, 2020 after

Steven Mnuchen, knowing the "TikTok Global" brand and divestiture strategy had been appropriated from the Plaintiff, determined to possess it and begin using it to undermine the U.S. Government's efforts to enforce the legal ban.

105. The Z-Bot RICO defendants also violated 13 section 1341 (relating to mail fraud) and section 1343 (relating to wire fraud) on Sep. 14, 2020 by forwarding the email communication the Plaintiff had sent to CFIUS, ByteDance, TikTok, and Zhang, and causing it to be forwarded to Mnuchen.

106. The co-conspirators and members of the Z-Bot RICO knew that sending the CFIUS Sep 14 confidential documents the Plaintiff had submitted was being done outside the rules and requirements CFIUS and the Treasury Department require.

107. The CNBC concocted origin story for Mnuchin's "TikTok Global" was quickly echoed by all major media outlets, thereby propagating a falsehood across America via a vast echo chamber.  Key news sources covering the EO after the Plaintiff's CFIUS submission on September 14, 2020 cited Mnuchin's Sep 14 "TikTok Global" while omitting mention of Plaintiff's transaction.   Also leveraging the nationwide reach of Mnuchin's CNBC announcement to deliberately undermine a valid, CFIUS-certified acquisition agreement for TikTok U.S.

108.   Ultimately, the Defendants' plan to let a co-conspirator seize the Plaintiff's brand before its proper unveiling—as the sole, timely, and fully compliant CFIUS acquisition agreement—dealt a catastrophic blow to the Plaintiff.

109.   This calculated conspiracy inflicted severe antitrust injury upon the Plaintiff, brutally barring them from acquiring TikTok's U.S. operations despite their submission of two legitimate offers, fully in line with all CFIUS requirement.

110.   ByteDance continued to pursue the non-compliant Oracle partnership, to

retain control of its U.S. operations in violation of the E.O.

**September 15, 2020 Plaintiff Notifies Oracle of CFIUS Submission.**

111.    After September 14, 2020, instead of working with ByteDance and CFIUS to close its acquisition, Plaintiff was forced to make an unexpected pivot, and in emergency fashion,  attempt to protect its brand identity,  create public awareness of the misappropriation Plaintiff had fallen victim to, and create public awareness  of its pending, CFIUS-compliant offer.

112.    Plaintiff  took decisive action betting it could utilize its CFIUS-certification edge, fully aware that Oracle, Microsoft, and Walmart lacked this critical certification.

113.    On September 15, Plaintiff put Defendants  on notice its covered transaction was protected under CFIUS § 800.213(d)[8] thru contacting Oracle President Safa Catz, stating (**Ex. 5**):

> "Hello Ms. Catz,
>
> I was the Founder of Myspace and Chairman/CEO of its publicly traded Parent company, eUniverse, Inc.
>
> -see CNBC Maria Bartiromo video interview for quick color/background at www.mypalisadescapital.com/about
>
>         Today I am contacting you as the CEO of TikTok Global Network Inc. ('TGN') a company that has timely submitted the information and materials to get CFIUS approval of a "proposed sale" under the President's August  14, 2020 E.O. that "effectuates" (see pages 4-7 of attached which is a portion of the asset acquisition agreement for your evaluation) the ordered "divestment". (see Sep 9, 2020 CFIUS & Sep 14, 2020 submission, pg. 1 & 10 of attached pdf)

----

[8] § 800.213(d) states Any other transaction, transfer, agreement, or arrangement, the structure of which is designed or intended to evade or circumvent the application of section 721

It would be great to work with Oracle accomplishing the same goal the President's two related executive orders seek to facilitate. Further, I think that in the long run, Oracle and the United States would be better served partnering with an experienced operator of business to consumer social media assets who is a U.S. Citizen and under a structure that truly divests the assets per the President's E.O.

TGN would certainly be willing to commit to exclusively use Oracle security, cloud and data storage services (as far as outside service providers or partners for those types of products). TGN would also guarantee the same rates/consideration that Oracle has been offered to get the benefit of from ByteDance.

(also I plan to contribute two additional video and livestreaming technology companies with large audiences I control concurrently with the acquisition of TikTok U.S. assets, so there would be even more exciting growth prospects for all involved parties! )

(1)     Can you confirm Oracle is willing to provide the same services on same pricing its agreed to provide to ByteDance for satisfying CFIUS* if TGN is successful getting Sec(d)(ii)**approval? (under CFIUS review since September 14, 2020)

(2)     In addition to strictly the aforementioned service provider role, TGN would welcome Oracle's joining and participating as part of the TGN investor group for any amount up to $10,000,000,000 cash? (But investment by Oracle would not be required to participate in the security/data safety/storage capacity Described in part (1)

(3)     Please also consider an additional way to work together which would be for Oracle to inform ByteDance it will only be willing to provide its services for the TikTok U.S. assets (as defined by the Aug 6/14 E.O.s) thru a U.S. company they have been transferred or sold to as part of a "divestment", including thru the structure Oracle has now become aware that TGN is/has offered to ByteDance.

(Unfortunately, the last second effort by ByteDance to offer up a non "divestment" solution involving Oracle as part of its involved parties may  or could distract, slow, or prevent ByteDance from fully and fairly considering the aforementioned Sep 14, 2020 Asset Purchase Agreement (which Oracle is now aware of). Based on this new information, please consider that Oracle under the non "divestment" proposal to CFIUS may be unwittingly being used by ByteDance or its affiliates like Sequoia China to contravene Aug 14 E.O. section 2(f) which states (f) Any transaction or  other device entered into or employed for the purpose of, or with the effect of, evading or circumventing this order is prohibited. Or Aug 6 E.O Sec 2(a),(b) Sec. 2. (a) Any transaction by a United States person or within the United States that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate the prohibition set forth in this order is prohibited. (b) Any conspiracy formed to violate any of the prohibitions set forth in this order is prohibited. "

"***Sec.2. Actions Ordered (d)ByteDance shall not complete a sale or transfer

under section 2(b) to any third party: (i) until Byte Dance notifies CFIUS in writing of the intended recipient or buyer; and (ii) unless 10 business days have passed from the notification in section 2(d)(i) and   CFIUS has not issued an objection to ByteDance. "

114.    Plaintiff did not get any response or reply from Oracle to its September 15, 2020 notification letter sent to President Catz.

### 2020 Congressional Notifications

115.    The realization dawned that ByteDance was steering towards an unconventional partnership with Oracle, defying the Executive Order and retaining control of TikTok's U.S. operations.

116.    Plaintiff briefed select members of Congress such as Senators Hawley and Rick Scott of Florida on or around September 17, to inform them about its CFIUS submissions and the actions taken by the Defendants to scuttle Plaintiff's acquisition.  These credible individuals will serve as patriotic sources of truth in this matter. (**Ex. 6**).

### The September 20, 2020 Predicate Acts

117.    Bytedance publicly endorsed Mnuchin's "TikTok Global" venture thru a message titled "An update for our TikTok family"  (**Ex. 7**)  sent to its over hundred million U.S. users ON September 20, 2020, stating:

> "We're pleased that today we've confirmed a proposal that resolves the Administration's security concerns and settles questions around TikTok's future in the US. Our plan is extensive and consistent with previous CFIUS resolutions, including working with Oracle, who will be our trusted cloud and technology provider responsible for fully securing our users' data. We are committed to protecting our users globally and providing the highest levels of security. Both Oracle and Walmart will take part in a TikTok Global pre-IPO financing round in which they can take up to a 20% cumulative stake in the company. We will also maintain and expand the US as TikTok Global's headquarters while bringing 25,000 jobs across the country."

118.    Zhang, ByteDance, and TikTok, violated 8 U.S. Code § 1831(a)(1) because they were without authorization appropriating Plaintiff's "TikTok Global" brand and divestiture strategy, it was benefitting China PRC, and they further concealed by fraud, artifice, and

deception the fact that "TikTok Global" was the Plaintiff's company and the strategy had been created by the Plaintiff. Instead they used CNBC to make false statements while omitting all mention of Plaintiff's CFIUS certification on Sep 9th 2020 and the Sep 14, 2020 acquisition agreement and CFIUS notice, along with the strategy briefings.

119.   In sending the message, Defendants were concealing crucial information from CFIUS regarding the only incorporated and first TikTok Global submissions and agreements Bytedance was part of.

120.   The Z-Bot RICO violated 8 U.S. Code § 1831(a)(3) on September 20, 2020 after Mr. Zhang, TikTok, ByteDance, knowing "TikTok Global" brand and divestiture strategy to have been appropriated from the Plaintiff's predecessor determined to possess it and begin using it for the benefit of Z-Bot RICO Enterprise to undermine the U.S. Government's efforts to enforce the legal ban, while removing the only viable timely CFIUS approve certified buyer, TG.

121.   The Z-Bot RICO violated 8 U.S. Code § 1831(a)(2) because without authorization Zhang, ByteDance, and TikTok, transmitted, delivered, sent, mail, communicated, or conveyed trade secrets including Plaintiff's September 14, 2020 CFIUS notice including the strategic acquisition plan and structure along with the TikTok Global brand and related trade secrets the Plaintiff had developed and shared with the defendants.  Zhang, ByteDance, and TikTok then conveyed these confidential materials to Oracle, Covington & Burlington, without Plaintiff's authorization.

122.   The Z-Bot RICO defendants ByteDance, Zhang, and TikTok also violated 13 section 1341 (relating to mail fraud) and also section 1343 (relating to wire fraud) on Sep. 20, 2020 thru sending out a false misleading email message to millions of their users in the United States falsely claiming "we've confirmed a proposal that resolves the Administration's security concerns and settles questions around TikTok's future in the US.".

123.    The defendants had done no such thing nor did they tell their users in the email message which acted as wire fraud and mail fraud, that one purpose of the Sep 20, 2020 letter was to misappropriate Plaintiff's "TikTok Global" brand and to insure the Plaintiff's CFIUS bona fide acquisition stayed concealed and could not be used to actually resolve what the defendants were obligated to do, divest TikTok U.S. from ByteDance.

124.    Nor did the defendants tell the millions of users and the public news reporters covering the divestiture, that the email was meant to mislead the public about the viable options for resolving the legal issues defendants were facing.

125.    Plaintiff efforts became increasingly more difficult as it now needed reporters it was in contact with to understand the complexities and legal implications of what Defendants' potential CFIUS 2(d)(i) violations.

**Plaintiff Achieves CFIUS 2(d)(ii) Approval**

126.    On September 23, 2020 CFIUS Sec (2)(d)(ii) approval was granted for the certification information provided to CFIUS on September 9, 2020.

127.    Increasingly concerned with the lack of progress, Plaintiff submitted an updated Asset Purchase Agreement to ByteDance on September 24th, increasing the deal value to $58 billion through (**Ex. 8**)

- $36 billion in cash;

- $7.5 billion in guaranteed advertising purchases;

- $5 billion in prepaid advertising credits;

- $5.5 billion in employee stock options; and

- $4 billion in assumed liabilities

128.    During the months of September and December 2020, affiliates sent emails to journalists to inform them about the CFIUS "TikTok "proposed sale" agreement under review by ByteDance & Federal Government.

129.   On Sep. 27th Plaintiff contacted TikTok's Chief Legal Officer directly (**Ex. 9**), stating:

> "Mr. Erich Andersen Chief Legal Officer TikTok Inc.
> Cc: John E. Hall Megan Keegan
> Globalmedia@bytedance.com ir@bytedance.com
>
> Attn: Please forward a copy of this letter to ByteDance LTD CEO Mr. Yiming Zhang.
>
> Dear Mr. Andersen,
>
> After TikTok Global Networks' (TGN) $33.3 billion dollar offer to acquire Tiktok U.S. assets from ByteDance LTD (BD), delivered by email  at 2:06am est on September 14, 2020 we were surprised to learn that BD later that day put out a statement agreeing to sell 100% of the non-China TikTok operations and assets.
>
> TGN seeks your urgent full consideration and that of TikTok Inc. owner BD to agree to effectuate the August 14, 2020 E.O. by selecting one of the ready to be consummated Asset Purchase Agreements TGN is offering herein for either $33.3 billion dollar (U.S. assets less China) or $58.0 billion dollars (Global assets less China)."
>
> 118. Page 1 of email, footnote 1, provided explicit CFIUS notice:
>
> "CFIUS was notified of the potential buyer (as defined in August 14, 2020 E.O.) on September 9, 2020 in writing, previously reviewed the structure of the offers made today on September 14th, and did not assert any. Sec 2.(d)(ii) objections to either in the 10 business days following each. (see Exhibit 5.2 of each attached agreement)"

130.   Plaintiff again raised the benefits of its CFIUS approved executable agreement:

> "The opportunity here for BD is to use the fortuitous timely executable agreement to possibly nip in the bud having the Judge rule on the facts, but certainly take the actions necessary during the day to work with the DOJ  and CFIUS to stop the ban from going in effect at midnite thru gaining their recognition and acceptance of the fact BD has effective immediately on entering into one of the TGN Asset Purchase Agreements, done everything needed with the next deadline being providing a certification of divestment on

November 12, 2020.

    1. Buyer & Agreement structure have already been reviewed by CFIUS without objections.[1]

    2. Offers are full definitive buyer executed agreements, becoming bona fide binding agreements subject only to BD counter signing. " (Id.)

131.    ByteDance and CEO Yiming Zhan, despite the best efforts of Plaintiff, refused to accept either of the two genuine buyout offers made. Plaintiff believes that ByteDance's refusal to cooperate was and continues to be not only harmful to their business interests but also detrimental to national security concerns raised during the CFIUS review process. As a result, they are determined to pursue legal action for justice.

**The 2022 No TikTok On Government Devices Act**

132. On December 14, 2022, President Biden signed into law the "No TikTok on Government Devices Act," which states in Sec 2(a)(1) that TikTok is a "covered application," referring to the social networking service TikTok or any successor application or service developed or provided by ByteDance Limited or an entity owned by ByteDance Limited. Sec 2(b) details a "Prohibition On the use of TikTok."

133. However, the Defendants have taken controversial actions that seem to flout Federal law, yet again including tapping into their strategic cloud partner Oracle among others, which appears to be a strategic move. Moreover, the Defendants have not registered their lobbying activities in a timely manner under FARA regulations, which violates a clear statute in place to protect the American public from corruption in U.S. politics and the influence of foreign government-controlled or affiliated companies or unincorporated associations.

134. Specifically, ByteDance must provide evidence of how it was able to secure its CEO's attendance at the President's January 20, 2025 inauguration just 72 hours after its emergency appeal to the Supreme Court was denied and its ban upheld, without making any

FARA lobbying disclosures.



135.    The transaction was still open until the Completion date under 800.206 occurred, at which point the ownership interest transferred to the Plaintiff under the agreement Plaintiff certified was on the table and actionable with ByteDance.

136.    Plaintiff and its predecessor through filing this complaint further rescinds the CFIUS submitted acquisition agreements it executed and terminates these agreements for non-performance by the Defendants.

137.    Plaintiff spent significant time contacting multiple senior executives at ByteDance to bring them up to speed on their proposed rescue buyout plan, which had been previously endorsed by the CEO and IR department during the CFIUS application process.

138.    Despite this, ByteDance has remained resolute in their decision, leaving the Plaintiff with no choice but to take legal action.

139.    TG has endured tremendous damages including crushing lost profits and priceless business opportunities that would have flowed naturally from a successful acquisition of TikTok's U.S. operations.

140.    Plaintiff TG is unequivocally entitled to recover these losses.

141.     Their legitimate bids, compliant with all CFIUS requirements, were ignored, leaving them to bear the brunt of antitrust injury.

142.     It is evident that the alleged conduct of ByteDance and Oracle has not only harmed competition more broadly by maintaining ByteDance's control over TikTok in violation of national security directives aimed at increasing competition and protecting U.S. user data, but also deprived consumers of the myriad benefits that come with robust competition in the vibrant world of social media.

143.     Defendants also remain in direct violation of the U.S. Supreme Court's order upholding the Federal ban, revealing a concerning disregard for legal authority.

144.      It is clear that Plaintiff now has no choice but to reclaim what was lost: an opportunity to transform online engagement dramatically while ensuring those who perpetrated this subterfuge are held accountable.

### February 28, 2025 Executive Order

145.     On February 28, 2025, the President of the United States issued an executive order suspending defendant ByteDance's long time law firm, Covington & Burlington LLP members Federal security clearances.[9]

    i.    "pending a review of their roles and responsibility in the weaponization of the judicial process."

    ii.   "This action also initiates a comprehensive review of all Federal contracts

_____

[9] . "ADDRESSING THE WEAPONIZATION OF GOVERNMENT: Today, President Donald J. Trump signed a memorandum to suspend security clearances for Covington & Burling LLP employees"
     "Security clearances held by Peter Koski and potential other members of Covington & Burling LLP who assisted former Special Counsel Jack Smith will be suspended, https://www.whitehouse.gov/fact-sheets/2025/02/fact-sheet-presiden...government-contracts-for-involvement-in-government-weaponization/

with the firm to ensure alignment with the interests of the American people."

    iii.    "All contracts with Covington & Burling LLP will undergo a detailed evaluation to ensure agency funding decisions align with American citizens' interests "

"Individuals who hold government-issued security clearances bear a responsibility to uphold impartiality and the national interest. "

"Covington & Burling LLP provided former Special Counsel Jack Smith with $140,000 in free legal services prior to his resignation from the Department of Justice."

## STANDING

146.    Plaintiff has standing to bring this action because it has suffered concrete, particularized injuries that are fairly traceable to Defendants' conduct and redressable by a favorable decision from this Court.

147.    Plaintiff's injuries include: (1) the loss of a valuable business opportunity to acquire TikTok's U.S. operations; (2) the misappropriation of its corporate identity and branding; (3) the suppression of its CFIUS-compliant bid; and (4) the anticompetitive exclusion from the market for social media platforms.

148.    These injuries are directly traceable to Defendants' actions in conspiring to reject Plaintiff's legitimate acquisition offers, misappropriating Plaintiff's corporate identity, and engaging in anticompetitive conduct to maintain ByteDance's control over TikTok's U.S. operations.

149.    A favorable decision from this Court would redress Plaintiff's injuries by: (1) requiring ByteDance to divest TikTok's U.S. operations to Plaintiff; (2) awarding damages for Plaintiff's lost business opportunity; and (3) enjoining Defendants from continuing their anticompetitive conduct.

150.    Plaintiff's injuries are not speculative. Plaintiff submitted concrete, executable

acquisition agreements that were fully compliant with CFIUS requirements. Plaintiff had the management expertise, and technical capabilities necessary to successfully acquire and operate TikTok's U.S. operations.

151.    Plaintiff's injuries are within the zone of interests protected by the antitrust laws, which are designed to protect competition and prevent the kind of exclusionary conduct engaged in by Defendants.

152.    Beijing Telecomm, ByteDance, Tiktok, the ByteDance CEO Zhang, and Oracle engaged in an unlawful conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. The victims of this grand scheme was the Plaintiff, whose aspirations to acquire TikTok's U.S. operations were dashed. Their coordinated actions constitute a violation of antitrust laws through: "

153.    **Market Allocation and Division:** ByteDance maintained control over TikTok's  U.S. operations through a sham "partnership" structure, effectively allocating the U.S. short video social media market between itself and Oracle while excluding other potential acquirers like Plaintiff.

154.    **Group Boycott**: ByteDance conspired to boycott TG's legitimate acquisition  offers. Despite Plaintiff TG submitting offers of $33.3 billion and later $58 billion in compliance with all CFIUS requirements, ByteDance refused to respond to or negotiate with TG, instead pursuing the non-compliant Oracle partnership. This boycott was designed to prevent TG from competing for  the acquisition of TikTok's U.S. operations.

155.    **Bid Rigging:** ByteDance coordinated with Mnuchin to manipulate the CFIUS review process and ensure Oracle's selection as the "trusted technology partner" while suppressing TG's  compliant $33.3 billion bid submitted on September 14, 2020.

156.    **Concerted Refusal to Deal**: ByteDance and Oracle engaged in a concerted

refusal to deal by refusing to respond to or negotiate with TG regarding its CFIUS compliant acquisition agreements for consideration totaling $33.3 billion and later $58 billion as required under § 800.401, instead pursuing the non-compliant Oracle partnership in furtherance of their conspiracy.

**FIRST CAUSE OF ACTION**
(Section 1 of the Sherman Act, 15 U.S.C. § 1)

157.    Plaintiff incorporates by reference paragraphs 1-156 above as if fully set forth herein.

158.    ByteDance and Oracle colluded in a ruthless scheme that shackled trade by ruthlessly blocking legitimate acquisition offers for TikTok's U.S. operations.

159.    This calculated ploy preserved defendants' grip on the platform—an overt  defiance of national security directives—while stubbornly refusing to sell equity interests to American citizens.

160.    Defendant blatantly is now ignoring a Supreme Court appeal ban, while crushing competition in the social media arena, after blatantly sidestepping required CFIUS procedures.

161. In an even graver act, ByteDance and Oracle plunged into an illegal conspiracy, flagrantly breaching Section 1 of the Sherman Act, 15 U.S.C. § 1. As the law states, "Every contract, combination … or conspiracy, in restraint of trade or commerce … is declared to be illegal." Their actions were nothing short of a deliberate assault on free competition.

162.    Specifically, ByteDance and Oracle conspired with cold precision to:

- Skirt proper CFIUS divestment procedures by fashioning a sham "partnership" in place of a bona fide divestment mandated by Executive Order;
- Deliberately muzzle and hide TG's bona fide $33.3 billion and $58 billion acquisition offers, which had faithfully followed all CFIUS protocols;
- Strategically collude with Mnuchin to herald Oracle as the "trusted technology

partner," all the while artfully concealing TG's pending, fully compliant CFIUS bid;

- Then brazenly appropriate Plaintiff's IP to mislead viewers on CNBC—falsely declaring that Oracle and ByteDance had sealed a deal to establish 'TikTok Global'—while furtively covering up that the CFIUS certifications submitted by Plaintiff and ByteDance had been the true catalyst for the Treasury Secretary's misguided "TikTok Global" hoax;

- Impose artificial obstacles designed to suffocate legitimate acquisition offers, ensuring ByteDance retained its oppressive control; and

- Undermine competition in the social media market by allowing ByteDance to hold onto TikTok's U.S. operations rather than divesting to an independent and competitive rival.

163.     These improper cloud "security" agreement and similar arrangements designed to bypass CFIUS wreaked havoc, inflicting serious antitrust injuries upon TG and poisoning market competition.

164.     This agreement was not merely a document signed in secrecy—it was a meticulously engineered maneuver, shrouded in subterfuge, designed to trap TikTok's future by perpetuating ByteDance's monopoly over its U.S. operations, all under a façade of legal compliance.

165.     This conspiracy struck Plaintiff with devastating force, obstructing their ability to complete the CFIUS certification divestment schedule and acquire TikTok's U.S. operations— even as they presented legitimate, compliant offers.

154.     Mnuchin's revelation of an impostor unincorporated "TikTok Global" was a calculated act of deception, suppressing TG's CFIUS-compliant bid despite it being the only transaction with an executable final agreement, while championing Oracle's non-compliant deal.

166.     Plaintiff thru one or more intermediaries strategically informed top media news outlets directly thru their top media journalists of the $33.3 then $58 billion dollar CFIUS acquisition agreements between September 14th and months end including Ana Sorenson and

34

Paul Mozur at the New York Times, Reporters Zoe and Casey at the Verge , Nick Wadhams at Bloomberg, Clare Duffey at CNN , D. Whately at Business Insider, Bobby Allyn at NPR, Brian Fung at CNN, and Arbel Tarbel at Thomson Reuters, among others (**Ex. 10**).[10]

167.    For example, NY Times reporter Ana Sorenson initially responded with enthusiasm but became confused when she discovered conflicting information about TikTok Global's $33.3 billion deal pending before CFIUS. The confusion stemmed from ByteDance directing Mnuchin's announcement of TikTok Global while suppressing Plaintiff's September 14, 2020 CFIUS acquisition agreement. Consequently, reporters moved on to different stories as they couldn't verify the details. (**Ex. 11**).

168.    The confusion caused by ByteDance's actions led reporters to abandon the story because: a) They could not verify the Plaintiff's alleged September 14, 2020, 5:04 AM $33.3 billion acquisition agreement under review by CFIUS. b) ByteDance was directing attention to Mnuchin's announcement of TikTok Global. c) The original Plaintiff's agreement was being suppressed.

169.    Reporters could confirm the story of TikTok Global that began later that same day when the Treasury Secretary announced a new deal involving ByteDance and adding 25,000 jobs to the U.S., which included public announcements by Oracle Corp, Walmart, and Microsoft.

170.    Even after Plaintiff increased its offer with a new acquisition agreement submitted to CFIUS and ByteDance on September 24, 2024, ByteDance's September 14th

-------------------------

[10] There was immediate and significant interest from almost all of the reporters contacted.

actions continued  to negatively impact press coverage for the Plaintiff.

171.    For instance, Plaintiff attempted again at the end of September with a letter shared with The Information "Subject: ByteDance leverages new $58 billion buyout offer to win injunction", but it too met with the same demise. (**Ex. 11**).

172.    Plaintiff suffered damages culminating in TikTok Global's March 2022 Delaware charter became inoperative and forfeited after the Sep 14th CNBC misappropriation including increasing accruing harms from diminished brand recognition when attempting to expand its investor syndicate. For instance, the Plaintiff reached out to a potential investor on September 9, 2020, publicly traded SPAC Pershing Square Tontine Holdings, Ltd, with whom they had no prior relationship. The Pershing SPAC failed to respond since they certainly encountered Mnuchin's Sep 14 CNBC "TikTok Global" during their evaluation of Plaintiff's proposal, rendering Plaintiff's introduction letter perplexing and any credibility the Plaintiff had hoped to establish with the Pershing SPAC irreparably damaged. (**Ex. 12**).

173.    Among their many anticompetitive tactics was the creation of a cleverly disguised subcontracting agreement under the guise of an Oracle "partnership" that allowed ByteDance to unrelentingly maintain control of TikTok's U.S. operations, while feigning adherence to the Executive Order.

174.    Alternatively or additionally the conspirators also employed an insidious tactic known as Complementary Bidding.

175.    Oracle's "trusted technology partner" proposal was merely a sham—a false divestment designed to project an illusion of compliance while permitting ByteDance to unremittingly hold the reins.

176.    This vicious anticompetitive conduct has directly sapped competition in the social media market by:

- Crushing legitimate acquisition offers for TikTok's U.S. operations;
- Solidifying ByteDance's tyrannical control of the platform in direct defiance of national security mandates;
- Suppressing healthy competition in the social media market;
- Evading necessary CFIUS procedures with reckless abandon;
- Engineering artificial barriers to entry; and
- Depriving consumers of the fruits of genuine competitive innovation.

177. Agreements between competitors to allocate markets, refuse to deal, or rig bids are per se violations of Section 1 of the Sherman Act.

178. As a direct result of ByteDance's unscrupulous interference, TG has suffered catastrophic damages.

179. These include crippling lost profits and the destruction of valuable business opportunities that would have naturally ensued from a successful acquisition of TikTok's U.S. operations had the process been allowed to proceed unobstructed, which TG is unequivocally entitled to recover. which TG is unequivocally entitled to recover.

180. Now, with the Supreme Court's decision in TikTok Inc. v. Garland, 604 U.S. ___ (2025), upholding the ban on TikTok unless its U.S. operations are severed from Chinese control, Plaintiff's acquisition offers—which were specifically designed to accomplish this severance—stand as the only viable solution to preserve TikTok's operations in the United States while complying with U.S. law.

181. ByteDance's continued refusal to divest TikTok's U.S. operations to Plaintiff, despite the Supreme Court's ruling, constitutes an ongoing violation of the Sherman Act and causes continuing harm to competition and to Plaintiff.

## SECOND CAUSE OF ACTION
### (Tortious Interference with Advantageous Business Relationship)

182. Plaintiff incorporates by reference paragraphs 1-181 above as if fully set forth herein.

183.    TG had a reasonable expectation of economic advantage from its bid to acquire TikTok's U.S. operations, having followed all required CFIUS procedures and submitted legitimate, fully-funded offers.

184.    TG's offers represented true divestment solutions that would have fully addressed the national security concerns that prompted the Executive Order, providing a clear path forward for TikTok's U.S. operations to continue under new ownership.

185.    TG also possessed the deep expertise necessary to successfully acquire and operate TikTok's U.S. operations: i. Its team included experienced executives with a proven track record in the tech industry. Ii. On September 9, 2020, TG took the formal step of submitting notice to CFIUS under Section 2(d)(i), signifying its intent to bid for TikTok U.S. iii. This was followed by the submission of formal acquisition offers fully executable to ByteDance on September 14, 2020, and September 24, 2020, illustrating a clear and deliberate commitment to the acquisition process. (**Ex. 3** and **Ex. 9**).

A.   ByteDance and TikTok interfered with Plaintiff TikTok Global's CFIUS certification agreements and legal notices including declarartions which carry obligations for all parties going forward upon CFIUS receiving such documents on September 9, 2020, and the additional acquisition agreement CFIUS approved which would then attach ByteDance and TikTok since they were already attached with CFIUS.

B.  Steve Mnuchen as a member of Z-BOT interfered with Plaintiff's business agreements being reviewed by Beijing Telecom and ByteDance and TikTok,

C.  If Byte Dance or TikTok is found to have violated CFIUS Regulation for avoiding or conspiring to avoid a transaction Like the one Plaintiff's Sep 14, 2020 CFIUS notice provided for

D. Z-BOT RICO Enterprise Covington & Burlington is interfering with Plaintiff's Rights under CFIUS and other due process rights because Covington interfered with the September 27, 2020 $58 billion dollar offer which was sent to Covington or that Covington became aware of And concealed instead of forwarding to its client in China, Beijing Telecom.

E.  Z-BOT Rico thru making vexatious litigant claim in Court against the CEO of the Plaintiff who is a non-party while omitting the exculpatory granted Federal Jan 2024 Request Judicial Notice on 9th circuit vexatious litigant jurisdiction that

would void the very legal orders the defendants will be citing. Request Judicial Notice Docket #794 in USA v. Google.

186.    ByteDance, acutely aware of TG's anticipation of economic gain, engaged in deliberate acts of interference. This included blatantly ignoring TG's properly submitted bids, actively pursuing a non-compliant transaction with Oracle, and strategically concealing TG's bids from public disclosure.

187.    Furthermore, ByteDance coordinated with Secretary Mnuchin to bypass the established CFIUS procedures, undermining the integrity of the process

188.    ByteDance's interference was both intentional and improper, driven by a motive to retain control over TikTok's U.S. operations in blatant violation of the Executive Order.

189.    This self-serving agenda was in stark contrast to the public interest, which prioritized national security and the principles of fair competition.

190.    As a direct consequence of ByteDance's improper interference, TG has suffered substantial damages.

191.    These include significant lost profits and valuable business opportunities that would have naturally flowed from its successful acquisition of TikTok's U.S. operations, had the process proceeded without obstruction.

192.    TG is entitled to recover the full extent of these losses.

193.    The Supreme Court's decision in TikTok Inc. v. Garland, 604 U.S. ___ (2025), further confirms the legitimacy of TG's expectation of economic advantage, as the Court has now made clear that TikTok's U.S. operations must be severed from Chinese control—precisely what TG's acquisition offers were designed to accomplish.

194.    ByteDance's continued refusal to divest TikTok's U.S. operations to Plaintiff,

despite the Supreme Court's ruling, constitutes ongoing tortious interference and causes continuing harm to Plaintiff.

## THIRD CAUSE OF ACTION
### (Unjust Enrichment)

195.    Plaintiff incorporates by reference paragraphs 1-194 as though fully set forth.

196.    ByteDance has unjustly reaped financial advantages by maintaining control over TikTok's U.S. operations through a strategic partnership with Oracle, all while sidestepping the genuine divestment mandated by the Executive Order.

197.    This maneuver allowed ByteDance to continue its grip on the lucrative TikTok market in the United States.

198.    ByteDance secured this benefit by willfully dismissing TG's legitimate acquisition proposals and deftly circumventing the procedural requirements of the CFIUS. Defendants Beijing Telecom and ByteDance happily accepted and made use of the proprietary strategic briefs the Plaintiff provided in August and September 2020. For example, this page from one of the briefings Plaintiff provided at no cost, helped provide new options and strategies that benefitted the defendant.



(page 5 of confidential work produce for client Beijing Telecom, August 2020
Strategy Briefing Plaintiff Distributed to Over 20 ByteDance Senior Executives
and Lawyers as part of Operation "White Knight Last Minute Rescue To Help
USA By An American Citizen")

199.    Despite having ample opportunities, Defendants ByteDance and its CEO
Mr. Zhang both copied on the September 9 and 14th, 2020 CFIUS submissions never once
demanded a termination of the definitive agreement, CFIUS certification, or CFIUS approvals.
ByteDance's head of Public Relations also received or accessed the same critical data.

200.    Even later after ByteDance's U.S. lawyers got their hands on copies of the
CFIUS certification from the Plaintiff, neither did ByteDance's attorneys ever dare to request
to terminate or cancel the CFIUS application and certification its client was a party to. And
why would they?

201.    Plaintiff's CFIUS certification likely represented the sole legally certified,
CFIUS- approved bidder for ByteDance and TikTok in the high-stakes arena of 2020.
Plaintiff's CFIUS application was ByteDance's fall back option or alternatively was a
bargaining chip used by ByteDance to optimize its negotiations with Oracle.

202.    The actions of ByteDance were executed with deliberate bad faith and an
ulterior motive to persist in exercising control over TikTok's U.S. operations, thereby flouting
the  directives of the Executive Order.

203.    By holding onto TikTok's U.S. operations, ByteDance has continued to draw
substantial profits, tapping into the vast revenue stream generated by American users.

204.    This persistent profit accrues despite the unfulfilled divestment stipulation
outlined in the Executive Order.

205.    Allowing ByteDance to retain the benefits gained through such improper

conduct would be inequitable.

206.    ByteDance's retention of these advantages comes at the expense of TG, which unjustly deprived of the opportunity to acquire TikTok's U.S. operations, despite having submitted legitimate offers that complied with all CFIUS requirements.

207.    As a consequence of this unjust enrichment by ByteDance, TG is entitled to restitution in an amount to be determined at trial, but no less than the substantial value of TG's $58 billion offer for TikTok's U.S. operations.

208.    The Supreme Court's decision in TikTok Inc. v. Garland, 604 U.S. ___ (2025), further confirms the inequity of ByteDance's continued retention of benefits from TikTok's U.S. operations, as the Court has now made clear that these operations must be severed from Chinese control—precisely what TG's acquisition offers were designed to accomplish.

209. Defendants' continued refusal to divest TikTok's U.S. operations to Plaintiff, despite the Supreme Court's ruling, constitutes ongoing unjust enrichment and causes continuing harm to Plaintiff 210.  The Supreme Court's decision in *TikTok Inc. v. Garland*, 604 U.S. ___ (2025), further confirms the deceptive nature of ByteDance's conduct, as the Court has now made clear that TikTok's U.S. operations must be severed from Chinese control— precisely what TG's acquisition offers were designed to accomplish, and what ByteDance falsely portrayed the Oracle partnership as achieving.

211.    ByteDance's continued refusal to divest TikTok's U.S. operations to Plaintiff, despite the Supreme Court's ruling, constitutes ongoing deceptive and unfair trade practices and causes continuing harm to Plaintiff.

**FOURTH CAUSE OF ACTION**
**(Florida Deceptive and Unfair Trade Practices Act)**

212. Plaintiff incorporates by reference paragraphs 1-211 as though fully set forth.

213.  ByteDance falsely portrayed the Oracle partnership as a genuine divestment

of TikTok's U.S. operations.

214. In reality, it was a cunning scheme designed to retain control while giving the illusion of compliance with the Executive Order.

215. Mnuchin's unexpected announcement was a brand mugging on a public stage, leaving a bitter taste in the Plaintiff's mouths.

216. Plaintiff's fully compliant CFIUS bid had been deliberately concealed and suppressed in favor of promoting Oracle's non-compliant proposal.

217. The Oracle proposal did not present a true divestment as required by the Executive Order, instead suggesting a partnership deal that would enable ByteDance to retain control.

218. This deliberate misrepresentation was crafted to mislead CFIUS, the general public, and potential bona fide buyers such as TG.

219. ByteDance was fully aware the Oracle partnership did not fulfill the criteria for a genuine divestment as mandated by the Executive Order.

220. ByteDance false representations were of significant importance because they pertained to the core nature of the transaction and its compliance with the Executive Order's stipulations.

221. As a direct and proximate result of ByteDance's deceptive business practices, TG has suffered substantial damages, including: (a) Loss of profits (b) Loss of business opportunities(c) Reputational damage, and (d) Legal and administrative costs.

222. Plaintiff, including predecessors TikTok Global Network Inc. and TikTok Global Inc., were damaged by ByteDance's deceptive conduct.

223. Plaintiff will be further damaged without intervention by this honorable Court and its just legal relief.

224. The Supreme Court's decision in *TikTok Inc. v. Garland*, 604 U.S. ___ (2025),

further confirms the deceptive nature of ByteDance's conduct, as the Court has now made clear that TikTok's U.S. operations must be severed from Chinese control—precisely what TG's acquisition offers were designed to accomplish, and what ByteDance falsely portrayed the Oracle partnership as achieving.

225.    ByteDance's continued refusal to divest TikTok's U.S. operations to Plaintiff, despite the Supreme Court's ruling, constitutes ongoing deceptive and unfair trade practices and causes continuing harm to Plaintiff.

## FIFTH CAUSE OF ACTION
### (Declaratory Relief)

226.    Plaintiff incorporates by reference paragraphs 1-225.

227.    An actual controversy exists between Plaintiff and Defendants regarding the rights to acquire and operate TikTok's U.S. operations in light of the Supreme Court's decision in TikTok Inc. v. Garland, 604 U.S. ___ (2025).

228. The Supreme Court has upheld the constitutionality of the Protecting Americans from Foreign Adversary Controlled Applications Act ("the Act"), which prohibits U.S. companies from providing services to TikTok unless U.S. operation of the platform is severed from Chinese control.

229. Plaintiff's acquisition offers were specifically designed to accomplish this severance of control, in full compliance with the requirements of CFIUS and the August 14, 2020 Executive Order.

230. Plaintiff's acquisition offers remain the only viable solution to preserve TikTok's operations in the United States while complying with U.S. law as interpreted by the Supreme Court.

231. ByteDance's continued refusal to divest TikTok's U.S. operations to Plaintiff, despite the Supreme Court's ruling, creates an actual controversy regarding the rights and

obligations of the parties.

232. Plaintiff seeks a declaratory judgment that: (a) Plaintiff's acquisition offers comply with the requirements of the Act and the August 14, 2020 Executive Order; (b) ByteDance is obligated to divest TikTok's U.S. operations in accordance with the Act and the August 14, N2020 Executive Order; (c) Plaintiff, as the only entity that submitted timely, compliant acquisition offers, has the right to acquire TikTok's U.S. operations; and (d) In the alternative, if ByteDance abandons TikTok's U.S. operations rather than divesting them, Plaintiff has the right to succeed to those operations as the only entity that submitted timely, compliant acquisition offers.

233. A declaratory judgment is necessary and appropriate at this time to clarify the rights and obligations of the parties in light of the Supreme Court's decision and to prevent further harm to Plaintiff and to the public interest in maintaining competition in the social media market.

### SIXTH CAUSE OF ACTION
**(Violation of 501.204   Unlawful acts and practices)**

234. Plaintiff incorporates by reference paragraphs 1-233

235. Under 501.204(1)   Unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful. Defendants caused Plaintiff to spend more money. Defending its trademarks and brands after the September 14, 2020. For instance, the false CNBC broadcast creating misappropriated Oracle deal "Liveleak Global", generated billions of dollars of lost economic opportunities, Plaintiff could not raise capital with the Confusion the defendants swirled into the market starting in September 2020, but it kept being re-circulated and re-affirmed by the defendants over many many months.

236. Defendants had the ability to immediately announce they had the wrong name

and they had made a mistake with the paperwork at CFIUS, and then allowing Plaintiff to get benefit of its CFIUS certification and standing with an approved asset agreement that had been reviewed by CFIUS in the minimum holding periods.

237.    Z-BOT RICO Enterprise interfered with Plaintiff's CFIUS Certification and agreement rights, and with Plaintiff's ByteDance, Beijing Telecom, Tiktok acquisition agreements, and continues in an ongoing Interference until terminating the false "TikTok Global" arrangement and admitting the newly announced in 2025, "TikTok America" would still be copying Plaintiff's strategy and idea of TikTok Global 2020, but now using new name.

238. That it was unfair method of competition to create fabricated "TikTok Global".[11] It irradiated the use of the brand for the Plaintiff in the weeks and months after September 14, 2020 accident. By March 1, 2022, the TikTok Global Inc was destroyed as Delaware Secretary shows, but up thru that date the Plaintiff was still attempting to consummate the deal with ByteDance and Beijing Telecom and Oracle.

239.    Plaintiff invited Oracle into a deal and to make an investment by way of September 15, 2024 letter to President Safa Catz.  That deal was interfered with, the Oracle deal was blocked by ByteDance, the Z-Bot Corp members, and Covington & Burlington, TikTok, Beijing Telecom interfered with Plaintiff's Oracle National Security cloud services white label.

---

[11] (b) Organizations. —

Any organization that commits any offense described in subsection (a) shall be fined not more than the greater of $10,000,000 or 3 times the value of the stolen trade secret to the organization, including expenses for research and design and other costs of reproducing the trade secret that the organization has thereby avoided.

**SEVENTH CAUSE OF ACTION**
**(VIOLATION OF RICO, 18 U.S.C. § 1962(c))**

240.    Plaintiff incorporates by reference paragraphs 1-239

241.    The Z-BOT RICO Enterprise constitutes an "enterprise" within the meaning of 18 U.S.C. § 1961(4).

242.    Defendants conducted and participated in the Enterprise's affairs  through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c) including:

- Multiple instances of mail and wire fraud (18 U.S.C. §§ 1341, 1343)

- Multiple instances of  (18 U.S.C. 1831)  economic espionage

- Multiple instances of bribery (18 U.S.C. § 201)

243.    These predicate acts were related, continuous, and caused direct injury to Plaintiff and predecessor TikTok Global Inc. (TG).

244.    This pattern of racketeering activity caused damages to Plaintiff  exceeding $58 billion dollars through:

a. Artificially depressed valuations

b. Lost business opportunities

c. Increased costs from anticompetitive conduct

245.    This conduct directly caused damages to Plaintiff and public every day it continues as a banned Foreign company attacking U.S. citizens' property must not be allowed to continue or it will have an adverse impact on the United States technology eco-system which is one of the most important in the world.

**EIGHTH CAUSE OF ACTION**
**(CONSPIRACY TO VIOLATE RICO, 18 U.S.C. § 1962(d))**

246.    Plaintiff incorporates by reference paragraphs 1-245

247.    Defendants conspired to conduct the affairs of the Z-BOT RICO Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

248.    Each Defendant agreed to participate in the conspiracy and committed overt acts in furtherance thereof.

249.    With Beijing Telecom, Oracle, ByteDance, TikTok, their law firm Covington Law who amazingly ByteDance engaged to represent it *after* the February President's Executive Order.

250.Covington is helping guide and direct the entire Z-BOT RICO enterprise to rid the defendants of significant legal claims for billions of dollars in damages from 2020, violations of U.S. Code § 201 (b)(1), Multiple instances of witness tampering (18 U.S.C. § 1512), Multiple instances of retaliation against witnesses/victims (18 U.S.C. § 1513), Multiple instances of money laundering (18 U.S.C. §§ 1956, 1957)

251.    This is a continuing conspiracy because of the fact that Plaintiff's LiveVideo.AI Corp should have been given first opportunity or equal opportunity to be offered purchase of Defendant if according to news reports, the defendant needs to be sold in a CFIUS approved transaction.

## PRAYER FOR RELIEF

**WHEREFORE**,  Plaintiff respectfully requests that this Court: (1) Enter judgment in their favor and against the Z-BOT RICO Enterprise, TikTok Inc., ByteDance, and Yiming Zhang; (2) **Compensatory Damages**: Award Plaintiff compensatory damages in an amount not less than $58 billion dollars, for the financial losses and damages suffered as a result of Defendants' unlawful conduct.; (3) **Punitive Damages:** Award Plaintiff punitive damages to punish Defendants for their willful, malicious, and fraudulent actions, and to deter similar conduct in the future. (4) **Treble Damages**: Award Plaintiff treble damages under RICO and pursuant to the Sherman Antitrust Act for the antitrust violations committed by Defendants. (5) **Injunctive Relief**: Grant preliminary and permanent injunctive relief requiring Defendants

to divest TikTok's U.S. operations to Plaintiff, in compliance with the August 14, 2020 Executive Order, and to cease any further anticompetitive practices. (6) Attorneys' Fees and Costs: Award Plaintiff reasonable attorneys' fees and costs incurred in bringing this action, as permitted by law; and (7) Award Plaintiff pre-judgment and post-judgment interest to the maximum extent allowed by law. (8) Issue a declaratory judgment clarifying the rights and obligations of the parties in light of the Supreme Court's decision in *TikTok Inc. v. Garland*, 604 U.S. ___ (2025); and Alternatively, Plaintiff should become the successor to any U.S. assets the banned companies abandon. Grant such other relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demand a trial by jury on all issues so triable.

**DATED:  May 19, 2025**                    Respectfully Submitted,

**REINER & REINER, P.A.**
*Counsel for Plaintiff*
9100 South Dadeland Blvd., Suite 901
Miami, Florida   33156-7815
Tel: (305) 670-8282; Fax: (305) 670-8989
dpr@reinerslaw.com; eservice@reinerslaw.com


By:
**DAVID P. REINER, II, ESQ.**; FBN 416400

## CERTIFICATE OF SERVICE

I certify I electronically filed this document on May 19, 2025, with the Clerk using CM/ECF, and certify this document is served on all counsel via transmission of Notices of Electronic Filing generated by CM/ECF.

By: 

**DAVID P. REINER, II, ESQ.**; FBN 416400