EXHIBIT #8

ASSET PURCHASE AGREEMENT

by and among


**Beijing Byte Dance Telecommunications Co. Ltd.,**

**BD**


**and**


TikTok Global Network Inc

TGN


Dated September 24, 2020

## ASSET PURCHASE, SALE AND TRANSFER AGREEMENT

This Asset Sale, Purchase and Transfer Agreement (this "Agreement") is made between **Beijing Byte Dance Telecommunications Co. Ltd** (the "Seller"), and TikTok Global Network Inc, an Arkansas corporation (the "Buyer" or "TGN") on this 24th day of September, 2020.

## RECITALS

WHEREAS, Buyer desires to acquire certain assets and business operations owned by Seller, and Seller is willing to sell such assets and business operations to Buyer, on the terms and conditions set forth in this Agreement.

## AGREEMENT

NOW, THEREFORE, for the good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

Definitions. As used herein, the following terms shall have the following meanings:

A. Assets. The term "Assets" shall mean TikTok App and Musical.ly a video entertainment app technology including but not limited to any data obtained or derived from TikTok application or Musical.ly application users in the United States and all countries/geos except for and excluding China, and further includes IP, agreements, contracts, documents, equipment and inventory, specifically designed to allow the app to continue to operate in the current manner subject to the limitations disclosed in Section 1.3.

B. Contracts. The term "Contracts" shall mean the contracts and leases described in Sections 1.1 and 1.2 and 1.4.

C. Closing. The term "Closing" or "Closing Date" shall have the meaning ascribed to it in Section 3.1.

D. Material Adverse Effect. The term "Material Adverse Effect" shall mean events which have an adverse effect in the aggregate which, measured in dollars, exceeds the sum of $10,000,000.

E. Material Contract. The term "Material Contract" shall have the meaning ascribed to it in Section 5.3.

F. Affiliate of Seller. The term "Affiliate of Seller" shall mean (i) any individual, partnership, corporation, or other entity or person which is owned or controlled directly or indirectly by Seller; (ii) any other individual, partnership, corporation, or other entity or person which controls or is controlled by or under common control with Seller; and (iii) any officer, director, partner, or owner of 10 percent or greater equity or voting interest in any such other corporation, partnership, or other entity or person.

G. Code. The term "Code" shall mean the Internal Revenue Code of 1986, as amended.

H. Agreement. "Agreement" shall mean this instrument and all Schedules and Exhibits attached hereto.

Agreement to Purchase and Sell.

1.1    Assets Purchased and Sold. At the Closing (as defined in this Agreement), subject to the performance of the duties set forth below, Buyer shall buy and Seller shall sell, assign, convey, transfer, set over, and deliver (by appropriate instrument of transfer) to Buyer all of the assets, rights, and interests of every conceivable kind or

character whatsoever, whether tangible or intangible, that on the Closing Date (as defined in this Agreement) are owned by Seller or in which Seller has an interest of any kind. These include, without limitation, those listed in Exhibit 1.1 and the following, (excluding, however, those assets specifically identified in this Agreement as the "Excluded Assets") (collectively, the "Purchased Assets") [Refer to and include the following applicable items]:

A. Tiktok.com website. Including all web domains and urls supporting the TikTok application or Musical.ly application users in the United States and all countries/geos except for and excluding China.

B. Miscellaneous Items. All patents, trademarks, trade names, copyrights, and/or licenses logos, slogans, trademarks, copyrights, know-how, processes, trade secrets, formulae, inventions, telephone numbers, telephone listings, computer programs, software programs, software and technical libraries, engineering data, electronic databases, all drawings, license agreements, and all other intellectual and/or proprietary information and property and applications for or licenses of used in connection with the Business or related to the assets  including Internet addresses for the Business.  However this list shall exclude any IP or source code that China's Government Agencies do not permit to be transferred or sold at the time of closing.

C. Purchase Orders. Any existing customer purchase orders that have not been completed before the Closing (Purchase Orders).

D. Customer List and Miscellaneous Records. Any records, files, lists, and other tangible assets that pertain to the Business, including lists and records pertaining to any one or more of the following: Seller's customers, suppliers, advertising, promotional material, sales, services, delivery, and/or operations, except those items, if any, required to be retained by law, including accounting records and returns including but not limited to inventory systems, hardware, software, records, customer lists, computers, office equipment and furniture. (Customer List and Miscellaneous Records).

E. Remote Assets. All assets located offsite from the Location or in the possession of others, but used in connection with the Business (Remote Assets). The status of the Remote Assets and the person or entity in possession or control of them shall be provided by Seller to Buyer at the Closing.

F. Contracts. All contracts and service agreements (Contracts) shall be delivered by Seller to Buyer at Closing;

 G. Sales Contracts and Service Records. All contracts and service records for sales, services, or leasing relating to the Business (Sales Contracts/Service Records) shall be delivered by Seller to Buyer at the Closing. Including Accounts receivables reflected on Seller's books for goods invoiced, shipped, or delivered, and advance payments generated or incurred by or in connection with the (including allowances for deductions from remittances, employee advances, rebates, receivables, deposits on bids) and other receivables and claims including claims against third parties which arise from acts or events occurring prior to the Closing Date;

H. Goodwill. The goodwill, telephone and fax numbers, and Seller's right to use registered name TikTok in United States and other countries and Geos TikTok currently operates or plans to expand into, excluding China, and all related names and derivations, including the Business Internet address(es), if any (Goodwill).

1.2 Assignment of Contracts.

(a). Contracts Assignable Without Consent. Seller agrees to assign or cause to be assigned to Buyer, as of the Closing, all of the rights of Seller under the Contracts that are assignable without consent of any third party and Buyer shall assume, as of the Closing, all obligations of Seller thereunder which arise before, at or after Closing.

(b). Seller to Use Reasonable Efforts. Anything in this Agreement to the contrary notwithstanding, Seller shall not be obligated to sell, assign, transfer or convey or cause to be sold, assigned, transferred or conveyed to Buyer, if applicable, any of its rights in and to any of the Contracts without first obtaining all necessary approvals, consents or waivers. Seller shall use all reasonable efforts, and Buyer shall reasonably cooperate with Seller, to obtain all necessary approvals, consents or waivers, or to resolve any impracticalities of transfer convey to Buyer, if applicable, each such Contract as soon as practicable; provided, however, that neither Seller nor Buyer shall be obligated to pay any consideration therefor except for filing fees and other ordinary administrative charges which shall be paid by Seller to the third party from whom such approval, consent or waiver is requested. Such approvals, consents, and waivers shall be in favor of Buyer. In the event Seller obtains consent to assignment of a Contract prior to the Closing, Buyer shall assume, as of Closing, all obligations of Seller thereunder which arise before, at or after the Closing, as though no consent was required.

(c). If Waivers or Consents Cannot be Obtained. To the extent that any of the approvals, consents or waivers referred to in have not been obtained by Seller as of the Closing, or until the impracticalities of transfer are resolved, Seller shall, during the remaining term of such Contracts, use all reasonable efforts to (i) obtain the consent of any such third party with the filing fees and ordinary administrative charges payable to such third party to be split equally by the parties; (ii) cooperate with Buyer in any reasonable and lawful arrangements designed to provide the benefits of such Contracts to Buyer, so long as Buyer fully cooperates with Seller in such arrangements; and (iii) enforce, at the request of Buyer and at the expense and for the account of Buyer, any rights of Seller arising from such Contracts against such issuer thereof or the other party or parties thereto (including the right to elect to terminate any such Contracts in accordance with the terms thereof upon the request of, and indemnification from, Buyer).

1.3 Transferring Permits and Licenses. (i) Seller will assign, transfer or convey, or cause to be assigned, transferred or conveyed to Buyer at the Closing those permits and licenses, to the extent that any Contract or any claim, right or benefit arising thereunder are held or used by the Seller in connection with the Assets and which can be assigned without having to obtain the consent of any third party with respect thereto. Seller will cooperate with Buyer in obtaining any third party consents necessary to the assignment or transfer of any other permits or licenses used or held by Seller in connection with the Assets which are so assignable or transferable; however, neither Seller nor Buyer shall be obligated to pay any consideration therefor except for filing fees and other ordinary administrative charges which shall be paid by Buyer to the third party from whom such approval, consent or waiver is requested. Buyer shall assume, as of Closing, all obligations of Seller arising prior to, at or after Closing under those permits and licenses which can be transferred without having to obtain the consent of any third party and those permits and licenses for which consent to transfer is obtained prior to Closing.

(ii) Certain licenses are known to Seller and Buyer to  as of the time the parties entered into this agreement, to not be transferable, including the right to the source code of Seller and the technology to operate its algorithim. These shall be listed under Exhibit 1.3. Both parties agree to work in good faith to instruct and direct the Seller's employees located in the United States or other offices outside of China to make a best efforts to reproduce or recreate or build new technology after the signing of this agreement and prior to the closing to effectuate replacement of the items listed under Exhibit 1.3.

## 1.6   Liabilities Assumed and Excluded.

A. **Assumed Liabilities.** As of the Closing Date, Buyer shall assume, pay, and perform in due course the liabilities of Seller under the Contracts arising after the close of business on the Closing Date and those trade payables and other liabilities specifically identified on attached Exhibit 1.6A (Assumed Liabilities) Which shall include further those listed in Exhibit 2.1's Ryder D. At the Closing, this Exhibit shall be updated and delivered by Seller to Buyer, and Buyer, at Buyer's election, may assume any liabilities in excess of the specific dollar amount described in the foregoing Exhibit.

B. **Excluded Liabilities.**

1. Except for the Assumed Liabilities, Buyer does not assume nor shall Buyer be obligated for any other liabilities or responsibilities whatsoever of Seller or the Business as conducted by Seller through the Closing Date (Liabilities)), including but not limited to the Retained Liabilities described in subparagraph (2) (Excluded Liabilities).

2. The Retained Liabilities shall remain the sole responsibility of and shall be retained, paid, performed, and discharged solely by Seller. As used in this Agreement, "Retained Liabilities" means every liability of Seller other than the Assumed Liabilities, including

i. any Liability arising out of or relating to products of Seller that are not related to the TikTok application or Musical.ly application users in the United States or other Countries or GEOS excluding China other than to the extent expressly assumed by Buyer;

ii. any Liability under any contract expressly assumed by Buyer as set forth in this Agreement that arises after the Closing Date but which Liability arises out of or relates to any breach associated with any such contract that occurred before the Closing Date;

2.1   **Purchase Price.** The consideration for the Purchased Assets (Purchase Price), will bev(a)  **$58,000,000,000** in cash and other forms of consideration made in the forms listed under Exhibit 2.1, Subject to adjustment in accordance with the provisions of this Agreement.

(b) the assumption of any assumed liabilities (Adjustment Amount). The Purchase Price, before adjustment on account of the Adjustment Amount, shall be delivered by Buyer to Seller as set forth in the next Section. The Adjustment Amount shall be paid at the Closing unless expressly set forth.

3.0   **Terms of Payment. Payment.** The Purchase Price shall be paid as follows:

A. $58,000,000,000 as further detailed in Exhibit 2.1. Of which, except as set forth in this Agreement, $5,500,000,000 shall be paid pursuant to the terms and provisions of a **Senior** promissory note (Senior Note) that Buyer shall execute at the Closing, and $13,000,000,000 shall be paid pursuant to the terms and provisions of a Junior Convertible Transfer Note (Junior Note) that Buyer shall execute at the Closing,. (forms of both are listed under Exhibit 3.0)

3.1 Closing.

3.2 Date of Closing. The Closing shall take place within 24 hours of Seller notifying Buyer that   Sec 2.(g) "the divestment is completed and verified to the satisfaction of CFIUS" has been achieved. At such place and time as the parties may agree in writing, a unless an earlier or later date are mutually designated by Seller and Buyer, and is referred to in this Agreement as the "Closing" or "Closing Date".

3.3 Documents to be Delivered by Seller. At or prior to the Closing, Seller shall deliver, or cause to be delivered, the following:

(a). documents of transfer, bills of sale, certificates of title and other instruments of transfer, dated the Closing Date, transferring to Buyer title to the Assets.

(b). documents evidencing the assignment and assumption of the Contracts to Buyer (together with any third-party consents required for such transfers) and the assignment and assumption of any permits and licenses

(together with any third-party consents required for such transfers) not transferred pursuant to Section 3.4(a), and the Assignment, Acceptance, and Assumption Agreement described in Section 1.8;

3.4 Documents to be Delivered by Buyer. At or prior to the Closing Date, Buyer shall deliver the following:

(a). documents evidencing the assignment and assumption of all Contracts and the assignment and assumption of all permits and licenses transferred by Seller to Buyer.

(b). a copy of the resolutions of the board of directors of Buyer authorizing the execution, delivery and performance of this Agreement by Buyer.

3.5 Transfer Taxes; Prorations. Any recording fees, transfer taxes, or sales taxes payable as a result of the sale of the Assets shall be paid by Seller.

3.6   **Title.** At Closing, title to the Purchased Assets shall be free, clear, and unencumbered, as set forth in this Agreement.

> A.   **Lien Search.** Seller shall provide Buyer a tax lien search and financing statement search, both certified to a date later than the Effective Date.

5.3  Litigation;    Seller will provide a list  under Exhibit 5.3 of all current existing litigation in which one or more of the assets or corporations being sold is a defendant currently and the amount of the damages claimed by the Plaintiffs in each case, the status of the case, and the name of law firm representing Seller currently.

6.3   **Creditors of Seller. Disclosure.** Before the Closing, Seller shall furnish to Buyer a true and complete list of all existing creditors. This list shall set forth the names and addresses of all of Seller's creditors and shall contain information regarding the nature and extent of the claim or claims of each creditor. Seller shall afford to Buyer or Buyer's authorized representatives access to Seller's books and records related to each claim and shall furnish Buyer with such financial and operating data and other information regarding each claim as Buyer may from time to time reasonably request.

7.7 Termination. This Agreement shall be terminated at any time either (i) prior to the Closing by mutual written agreement executed by Seller and Buyer; or  (ii)  Thru its Preferred or Alternative Transaction Termination exclusive right of Seller if Seller desires to exercise the right   for any one or more of the following reasons: convenience, receipt of a superior offer, a preferred future transaction structure with another Buyer, or any alternative transaction with one or more parties which Seller determines in its sole capacity will or is in its best interests to consummate,  then on the terms and conditions set forth in the POA Termination Side Letter Agreement  ( "POA Agreement").

*7.8 Termination Fee*. In the event that this Agreement is terminated pursuant to Seller's exclusive **Preferred or Alternative Transaction Termination  exclusive right** "('POA') summarized in Sections 7.7 the Seller shall  pay such amount as described and further defined  in the POA termination Side Letter Agreement which shall be executed concurrently with this Asset Purchase Agreement. The Seller acknowledges that the agreement contained in this Section, Section 7.7, the POA Termination Side Letter Agreement and herein is an integral part of this Agreement and the transactions contemplated hereby.  Notwithstanding anything to the contrary in the event that Buyer receives the Termination Fee as described and further defined in the POA Termination Side Letter Agreement, receipt of such shall be deemed to be liquidated damages for any and all losses or damages suffered or incurred by Buyer, any of its Affiliates, or any other Person in connection with this Agreement (and the termination hereof), the other Transaction Documents, the transactions contemplated hereby and thereby (and the abandonment thereof) or any matter forming the basis for such termination, and none of Buyer, or any of its  Affiliates, or any other Person shall be entitled to bring or maintain any other claim, action or proceeding

against the Seller or any of its Affiliates, stockholders, directors, or officers arising out of this Agreement, any of the other Transaction Documents, any of the transactions contemplated hereby or thereby or any matters forming the basis for such termination.

8. Default; Remedies;  Time is of the essence of this Agreement. If either party fails or refuses to carry out this Agreement according to its terms, the other party shall be entitled to the remedies set forth below, subject to Seller's sole determination to invoke Seller's right to terminate under the POA Termination Side Letter Agreement terms.

8.1   **Taxes; Tax Returns and Audits. Taxes.** All personal property taxes and other taxes of any nature assessed against Seller and/or the Purchased Assets are and will be fully paid by Seller when due through the Closing Date. Without limiting the generality of the foregoing, all federal, state, county, and local taxes, including, without limitation, income, corporate franchise, , stamp, transfer, sales and use, employee withholding, and ad valorem taxes due and payable by Seller on or before the Closing Date have been or will have been paid or provided for by Seller, including any unemployment tax liability..

9. Conduct of the Seller Pending Closing. Between the date hereof and the Closing Date, Seller shall continue to use the Assets in the ordinary course of business

10.  Post-Closing Assistance

    (a)   At any time and from time to time after the Closing, at Buyer's request, Seller will execute and deliver such other instruments of conveyance and take such other actions as Buyer  may reasonably request to perfect the transfer and conveyance to Buyer of the Purchased Assets and to consummate the transactions contemplated hereby.

    (b)   At any time and from time to time after the Closing, at Seller request, Buyer will execute and deliver such other instruments of conveyance and take such other actions as Seller may reasonably request to perfect the transfer and conveyance to Buyer of the Purchased Assets and to consummate the transactions contemplated hereby.

11.  Post-Closing Security Requirements

    (a)   At the closing date, and at all times over the next 5 years, Buyer shall at all times have a Board of Directors consisting of at least 5 Directors of which 3 are Independent and not related parties. The company will at all times employ standards and definitions Nasdaq requires of independent Directors for S&P 500 companies

    (b)   At the closing date, Buyer will certify it has retained an outside independent Trusted data storage and security company that Buyer will be responsible for compensating to provide 24 hours a day and 7 days a week to engage such service provider at a minimum for the same services that Oracle has offered to provide to TikTok or ByteDance in order to protect data of American citizens and effectuate the requirments of the August 14 E.O. including to CFIUS satisfaction.  At no time will Buyer allow the independent 3rd party Trusted data security service provider to own or be compensated with equity or shares in Buyer, nor will Buyer allow an employee or investor of Trusted Data storage and security service provider to serve on Buyer's board of directors. Further, Buyer will allow CFIUS access and direct 1:1 meetings with the Trusted data storage and security service provider to fulfill any audits which CFIUS requires.

12. Access by Seller to Books and Records. Buyer will retain and, make available to Seller any information relating to the Purchased Assets or the business formerly conducted by Seller as may be reasonably needed by Seller .

13. Representations of Seller. Seller represents to Buyer that: Organization, Standing and Authority. Seller is a corporation organized, existing, and in good standing under the laws of _____ and has the full corporate power and authority to enter into and to perform this Agreement.

14. Authorization of Agreement; Authority. Binding Effect; Assignment. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns. Except as expressly set forth herein, nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any person or entity not a party to this Agreement. No assignment of this Agreement or of any rights or obligation hereunder may be made by either party (by operation of law or otherwise) without the prior written consent of the other and any attempted assignment without the required consent shall be void;  The execution, delivery and performance of this Agreement by Seller has been duly authorized by all necessary corporate action of Seller, and this Agreement constitutes the valid and binding obligation of Seller, enforceable in accordance with its terms, except, unless and until to the extent under Sec. 2.(d)(ii),  Seller confirms CFIUS did "issue an objection to" Buyer in writing that Seller received within 10 business days of the section 2(d)(i) notification  on or about September 9, 2020 (see Exhibit 5.2).

Material Contracts. All of the Material Contracts which are to be transferred to Buyer at Closing have not been further modified, or amended. A Material Contract shall mean a Contract which involves payments, performance of services or delivery of goods by or to Seller after the Closing Date with value of fifty thousand dollars ($50,000.00) or more.

16. Representations of Buyer. Buyer represents to Seller as follows: Buyer's Organization. Buyer is a corporation organized, existing, and in good standing under the laws of Arkansas and has the full corporate power and authority to enter into and to perform this Agreement.

17.  Authorization of Agreement. The execution, delivery and performance of this Agreement by the Buyer have been duly authorized by all necessary corporate action the Buyer, and this Agreement constitutes the valid and binding obligation of Buyer enforceable against it in accordance with its terms, except to the extent enforceability may be limited by bankruptcy, insolvency or other similar laws affecting the enforcement of creditors' rights in general and subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

18.  Consents of Third Parties. The execution, delivery and performance of this Agreement by Buyer will not (a) violate or conflict with the articles of organization or by-laws of Buyer; or (b) constitute a violation of any law, regulation, order, writ, judgment, injunction or decree applicable to Buyer.

19. Further Agreements of the Parties.

20. Access to Information. Buyer shall have access to information and other Assets for due diligence inquiry purposes and to facilitate an orderly transition in the management of those Assets in anticipation of Closing.

21.      Financial Statements. The Historical Financial Statements (copies of which are attached hereto as Exhibit 7.3) (i) have been prepared in accordance with the books and records of Seller, and (ii) present fairly the financial condition of Seller  as of the respective dates indicated.  The Historical Financial Statements do not contain any untrue statement of any material fact nor fail to state any material fact required to be stated therein in order to make the Historical Financial Statements not misleading.

22.  Expenses. Except as otherwise specifically provided in this Agreement, Buyer and Seller shall bear their own respective expenses incurred in connection with this Agreement and in connection with all obligations required to be performed by each of them under this Agreement.

8

23.  Publicity. Buyer and Seller shall consult with each other before issuing any public announcement or press release concerning the transactions contemplated by this Agreement and, except as may be required by applicable law or regulation or rule of any stock exchange or organized securities market on which the securities of Buyer or Seller's securities listed or traded, will not make a public announcement or issue a press release prior to such consultation. If Buyer or Seller is so required to make a public announcement or issue a press release such party shall use its best efforts to inform the other party hereto prior to making or issuing it.

24.  Preservation of Records. (a). Buyer agrees that, without expense to Seller, Buyer shall preserve and keep the records and give Seller reasonable access to such records and personnel during regular business hours if needed for any bona fide purpose. (b). Buyer agrees that Buyer shall not destroy the records described in Subsection (a).

25.  Confidentiality. Seller and Buyer hereto covenant and agree that the terms and provisions of this Agreement and all information and data obtained in connection with this Agreement shall be treated as confidential. If this Agreement is terminated for any reason, the foregoing covenant shall survive the termination; if this Agreement is not so terminated then the foregoing covenant shall be deemed terminated at Closing.

26.  Choice of Law and Venue. All questions concerning the construction, validity and interpretation of this Agreement shall be governed by the law of the State of Delaware. Any dispute arising out of, or concerning, this Agreement or the employment relationship between the parties, shall be resolved exclusively in a state court of competent jurisdiction located in Delaware. To the extent necessary, the parties hereby submit to, and agree not to contest, the jurisdiction of such courts.

27.  **Indemnification.**

27.1  **Indemnification by Seller.** Seller shall defend, indemnify, and hold harmless Buyer and Buyer's agents and employees, heirs, representatives, successors, and assigns from and against any and all costs, losses, claims, liabilities, fines, expenses, penalties, and damages (including reasonable legal fees) in connection with or resulting from

A. all debts, liabilities, and obligations of Seller, whether accrued, absolute, contingent, known, unknown, or otherwise;

B. any inaccuracy in any representation or breach of any warranty of Seller contained in or made pursuant to this Agreement;

C. any failure by Seller to perform or observe in full, or to have performed or observed in full, any covenant, agreement, or condition to be performed or observed by the Seller under this Agreement.

D. the operations of Seller prior to the Closing Date, other than the Assumed Liabilities; and

27.2  **Indemnification by Buyer.** Buyer shall defend, indemnify, and hold harmless Seller and Seller's agents and employees, heirs, representatives, successors, and assigns from and against any and all costs, losses, claims, liabilities, fines, expenses, penalties, and damages (including reasonable legal fees) in connection with or resulting from

A. all debts, liabilities, and obligations of Buyer, whether accrued, absolute, contingent, known, unknown, or otherwise

B. any inaccuracy in any representation or breach of any warranty of Buyer contained in this Agreement; and

C. any Assumed Liability;

9

D. the operations of Buyer, or use of the Purchased Assets following the Closing Date.

28. Miscellaneous.

28.1 Finders. Buyer and Seller respectively represent and warrant that they have not employed or utilized the services of any broker or finder in connection with this Agreement or the transactions contemplated by it.

28.2 Entire Agreement. This Agreement contains, and is intended as, a complete statement of all of the terms of the arrangements between the parties with respect to the matters provided for, supersedes any previous agreements and understandings between the parties with respect to those matters, and cannot be changed or terminated orally.

28.3 Notices. All notices and other communications under this Agreement shall be in writing and shall be deemed given when delivered personally or mailed by registered mail, return receipt requested, to the parties at the following addresses (or to such address as a party may have specified by notice given to the other party pursuant to this provision):

If to Buyer to:

TikTok Global Network Inc

244 Fifth Avenue, Siote #g290 New York, NY 10001

If to Seller, to: **Beijing Byte Dance Telecommunications Co. Ltd.,**

_____

_____

28.5 Severability. The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement which shall remain in full force and effect.

28.6 Further Assurances and Assistance. Buyer and Seller agree that each will execute and deliver to the other any and all documents, in addition to those expressly provided for herein, that may be necessary or appropriate to effectuate the provisions of this Agreement, whether before, at or after the Closing. Seller agrees that, at any time and from time to time after the Closing, it will execute and deliver to Buyer such further assignments or other written assurances as Buyer may reasonably request to perfect and protect Buyer's title to the Assets.

28.7 Survival. The terms, covenants, agreements, representations and warranties contained in or made pursuant to this Agreement together with all indemnities and undertakings contained herein shall survive the Closing, subject to the time limits specified herein, if any, delivery of the Purchase Price and delivery and/or recordation of the instruments of conveyances and assignment, bills of sale, assignments of contract rights and other closing documents, and shall not be deemed to have been merged in any of the documents delivered at the Closing, irrespective of any investigation made by or on behalf of any party.

28.8 Waiver. Any party may waive compliance by another with any of the provisions of this Agreement. No waiver of any provision shall be construed as a waiver of any other provision. Any waiver must be in writing and signed by the party waiving such provision.

28.9   **Counterpart Execution; Facsimile Execution.**

A. **Counterpart Execution.** This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, and all counterparts, when taken together, will constitute one and the same agreement.

B. **Facsimile Execution.** The Parties agree that signatures on this Agreement, as well as any other documents to be executed under this Agreement, may be delivered by facsimile or by electronic transmission in lieu of an original signature, and the Parties agree to treat facsimile or electronic signatures as original signatures that shall be deemed to be originals and may be relied on to the same extent as the originals with the same binding legal effect as an original executed counterpart of this Agreement, as well as a counterpart of any other documents executed under this Agreement. This provision, however, shall not be applicable for Promissory Note, Bill of Sale that shall be executed at the Closing of this Agreement.

Buyer and Seller have executed this Agreement on the following dates to be effective as of the Effective Date:

30. No Recordation. Neither this Agreement nor a memorandum hereof shall be recorded in any jurisdiction or public record.

IN WITNESS WHEREOF, the parties have duly executed and delivered this Agreement of Substitution effective as of the date first above written.

**SELLER:**

_/s/ _____

 Name: _____
Title: _____

Beijing Byte Dance Telecommunications Co. Ltd.,

Dated: _____

**BUYER:**

_/s/ _____ _____

Brad Greenspan
President
TikTok Global Network Inc

Dated: _____ September 24, 2020 _____

Exhibits

| Exhibit | Description | Paragraph |
|---------|-------------|-----------|
| 1.1 | Legal Entities Containing Assets or Data | 1.1 |
| 1.3 | Non transferrable licenses or technolgy | 1.3 |
| 1.6A | Assumed Liabilities | 1.6A |
| 2.1 | **Purchase Price;** | 2.1 |
| 3.0 | **Form Notes** | 3.0 |
| 5.2 | CFIUS August 9, 2020 Sec 2(d)(i) Notice & August 14, 2020 Sec 2(d)(ii) Notice | 5.2 |
| 5.3 | **Existing Litigation** | **5.3** |

Additional Exhibits

(Documents to be delivered on or before the Closing)

| B | Seller Financial Statements | 7.3 |
|---|------------------------------|-----|
| C | List of Creditors | 7.2 |
| D | Seller Security Agreements and Mortgages | 8.5 |
| E | Payoff Letters | 8.5 |
| F | Licenses and Permits | 8.10 |
| G | Bill of Sale | 11.4A |
| H | Bill of Sale—Inventory | 11.4A |
| I | Real Estate Lease Assignment | 1.3A, 11.4A |
| J | Assignments of Contracts | 11.4A |
| K | Note | 3.2B, 12.3B |
| N | Collateral Assignment of Insurance | 3.4B |
| Q | Escrow Agreement | 5.6 |
| R | Evidence of Insurance | 8.8 |
| S | Articles of Incorporation or Organization | |
|   | A   Seller | 8.1 |
|   | B   Buyer | 9.1 |
| T | Resolutions | |
|   | A   Seller | 8.1 |
|   | B   Buyer | 9.1 |
| U | Bylaws / Operating Agreement | |
|   | A   Seller | 8.1 |
|   | B   Buyer | 9.1 |
| V | Certificate of Good Standing | |

A   Seller                                                                                    8.1
B   Buyer                                                                                    9.1


Z   **Patents, Trademarks, etc., of Seller.**                                1.6




Exhibit __
Trade Fixtures and Equipment (inclusive of Leasehold Improvements)

**[list items]**

Exhibit __
Real Estate Lease(s)

**[attach]**

Exhibit __
Personal Property Lease(s)

**[attach]**

Exhibit __
Assumed Liabilities

**[attach]**

Exhibit __
Purchase Price Allocation

**[Review and modify list of items and insert amounts.]**

A   Trade Fixtures and Equipment                                          $_____
B   Miscellaneous Items; Remote Assets                               $_____
C   Purchase Orders; Customer List and Miscellaneous Records    $_____
D   Contracts; Sales Contracts/Service Records                     $_____
E   Lease; Lease Assignment                                               $_____
F   Goodwill                                                                    $_____
                    **Subtotal:**                                        $_____
G
                                                                                 $_____

                    **Total:**                                            $_____


Exhibit __
List of Director, Managers,  Officers,

**[attach]**

13

EXHIBIT 1.1

TikTok Ltd. (Cayman)          ( )100% stock acquired or  ( )  Assets acquired

If only assets are being acquired, list assets:

1.

2.

3.

4.

5.

6.

7.

8.

9.

10.

  **Does entity contain** <u>any data obtained or derived from TikTok application</u> or Musical.ly application users in the United States?

Is entity a party to any contracts or service agreements related to the use, storage of, or providing any form of access to <u>any data obtained or derived from TikTok application</u> or Musical.ly application users in the United States? (If answer is yes, please list such contracts or service agreements below)

1.

2.

3.

4.

5

6.

7.

TikTok LLC (US)            ( )100% stock acquired or ( ) Assets acquired

If only assets are being acquired, list assets:

1.

2.

3.

4.

5.

6.

7.

8.

9.

10.

Does entity contain <u>any data obtained or derived from TikTok application</u> or Musical.ly application users in the United States?

Is entity a party to any contracts or service agreements related to the use, storage of, or providing any form of access to <u>any data obtained or derived from TikTok application</u> or Musical.ly application users in the United States? (If answer is yes, please list such contracts or service agreements below)

1.

2.

3.

4.

5

6.

7.

TikTok Inc. (US)(  )100% stock acquired or  (  )  Assets acquired

If only assets are being acquired, list assets:

1.

2.

3.

4.

5.

6.

7.

8.

9.

10.

Does entity contain <u>any data obtained or derived from TikTok application</u> or Musical.ly application users in the United States?

Is entity a party to any contracts or service agreements related to the use, storage of, or providing any form of access to <u>any data obtained or derived from TikTok application</u> or Musical.ly application users in the United States? (If answer is yes, please list such contracts or service agreements below)

1.

2.

3.

4.

5

6.

7.

17

-TikTok Information Technologies UK Ltd.  ( )100% stock acquired or  ()  Assets acquired

If only assets are being acquired, list assets:

1.

2.

3.

4.

5.

6.

7.

8.

9.

10.

   Does entity contain <u>any data obtained or derived from TikTok application</u> or Musical.ly application users in the United States?

Is entity a party to any contracts or service agreements related to the use, storage of, or providing any form of access to <u>any data obtained or derived from TikTok application</u> or Musical.ly application users in the United States? (If answer is yes, please list such contracts or service agreements below)

 1.

2.

3.

4.

5

6.

7.

18

TikTok Pte Ltd (Singapore) ( )100% stock acquired or  ( )  Assets acquired

If only assets are being acquired, list assets:

1.

2.

3.

4.

5.

6.

7.

8.

9.

10.

Does entity contain any data obtained or derived from TikTok application or Musical.ly application users in the United States?

Is entity a party to any contracts or service agreements related to the use, storage of, or providing any form of access to any data obtained or derived from TikTok application or Musical.ly application users in the United States? (If answer is yes, please list such contracts or service agreements below)

1.

2.

3.

4.

5

6.

7.

19

_____     ( )100% stock acquired or  ( )  Assets acquired

If only assets are being acquired, list assets:

1.

2.

3.

4.

5.

6.

7.

8.

9.

10.

Does entity contain <u>any data obtained or derived from TikTok application</u> or Musical.ly application users in the United States?

Is entity a party to any contracts or service agreements related to the use, storage of, or providing any form of access to <u>any data obtained or derived from TikTok application</u> or Musical.ly application users in the United States? (If answer is yes, please list such contracts or service agreements below)

1.

2.

3.

4.

5

6.

7.

_____   ( )100% stock acquired or  ( )  Assets acquired

If only assets are being acquired, list assets:

1.

2.

3.

4.

5.

6.

7.

8.

9.

10.

  Does entity contain <u>any data obtained or derived from TikTok application</u> or Musical.ly application users in the United States?

Is entity a party to any contracts or service agreements related to the use, storage of, or providing any form of access to <u>any data obtained or derived from TikTok application</u> or Musical.ly application users in the United States? (If answer is yes, please list such contracts or service agreements below)

 1.

2.

3.

4.

5

6.

7.

_____   ( )100% stock acquired or  ( )  Assets acquired

If only assets are being acquired, list assets:

1.

2.

3.

4.

5.

6.

7.

8.

9.

10.

   **Does entity contain** <u>any data obtained or derived from TikTok application</u> or Musical.ly application users in the United States?

Is entity a party to any contracts or service agreements related to the use, storage of, or providing any form of access to <u>any data obtained or derived from TikTok application</u> or Musical.ly application users in the United States? (If answer is yes, please list such contracts or service agreements below)

 1.

2.

3.

4.

5

6.

7.

_____        ( )100% stock acquired or  ( )  Assets acquired


If only assets are being acquired, list assets:

1.

2.

3.

4.

5.

6.

7.

8.

9.

10.


Does entity contain <u>any data obtained or derived from TikTok application</u> or Musical.ly application users in the United States?

Is entity a party to any contracts or service agreements related to the use, storage of, or providing any form of access to <u>any data obtained or derived from TikTok application</u> or Musical.ly application users in the United States? (If answer is yes, please list such contracts or service agreements below)

1.

2.

3.

4.

5

6.

7.

_____   ( )100% stock acquired or  ( ) Assets acquired

If only assets are being acquired, list assets:

1.

2.

3.

4.

5.

6.

7.

8.

9.

10.

**Does entity contain** any data obtained or derived from TikTok application or Musical.ly application users in the United States?

Is entity a party to any contracts or service agreements related to the use, storage of, or providing any form of access to any data obtained or derived from TikTok application or Musical.ly application users in the United States? (If answer is yes, please list such contracts or service agreements below)

1.

2.

3.

4.

5

6.

7.

24

_____    ( )100% stock acquired or  ( )  Assets acquired


If only assets are being acquired, list assets:

1.

2.

3.

4.

5.

6.

7.

8.

9.

10.


  Does entity contain any data obtained or derived from TikTok application or Musical.ly application users in the United States?

Is entity a party to any contracts or service agreements related to the use, storage of, or providing any form of access to any data obtained or derived from TikTok application or Musical.ly application users in the United States? (If answer is yes, please list such contracts or service agreements below)

 1.

2.

3.

4.

5

6.

7.

_____     ( )100% stock acquired or  ( )  Assets acquired

If only assets are being acquired, list assets:

1.

2.

3.

4.

5.

6.

7.

8.

9.

10.

  **Does entity contain** any data obtained or derived from TikTok application or Musical.ly application users in the United States?

Is entity a party to any contracts or service agreements related to the use, storage of, or providing any form of access to any data obtained or derived from TikTok application or Musical.ly application users in the United States? (If answer is yes, please list such contracts or service agreements below)

1.

2.

3.

4.

5

6.

7.

26

EXHIBIT 1.3

Non transferrable licenses or technolgy

1.

2.

3.

4.

5.

6.

7.

EXHIBIT     2.1

$58,000,000,000          ACQUISITION

CASH AND OTHER CONSIDERATION CONSISTING OF:

( A )   $36.0 billion in cash

( B )   -$7.5 billion in guaranteed ad/media purchases paid to BD over next 10 years

( C )   $5.0 billion in prepaid advertising credits good for 15 years, fully transferable

( D )   -$5.5 billion worth of employee stock options (vesting over 5 year term, 50% issuable to employees transferring employment fulltime to TGN & 50% issuable to BD non-transferring employees providing part time employment services or consulting services with current $30 billion valuation strike/exercise price)

(E).   -$4.0 billion liabilities assumed (shall include combination of leases, class action settlements, government fines)

**Total - $58.0 billion**

See Ryders A, B, C, D, E,  for further detail

Ryder A

<u>Scheduled Cash Payments:</u>

$36.0 billion in cash consisting of:

    i.    $10.0 billion in cash paid upon closing as defined under the acquisition agreement[1]

    ii.    $5.5 billion in cash thru Senior Promissory Note.

              Paid the sooner of Buyer becoming publicly traded[2] or 24 months from closing with such total guaranteed by Buyer and secured against all Buyer assets as the 1% Senior Promissory Note.

    iii.    $13.0 billion cash thru Junior Convertible Transfer Note.

              Paid upon the sooner of Buyer becoming publicly traded or for any amount not converted at maturity of 0% Junior Convertible Transfer Note.

    iv.    $7.5 billion in profit share (15% annual share of net profits over next 15 years[3]

*at option of ByteDance and upon 30 days notice, portions or all of the Junior Convertible Transfer Note (JCT) can be transferred to and converted into equity issued to u.s. former or current ByteDance shareholders or other entities that CFIUS does not object to. The JCT will convert  pro rata into an aggregate of 22.4% equity ownership with no individual converting shareholder owning more then 4.9% equity ownership of TGN. Maturity date shall be 5 years from "closing".

---

[1] In the event Buyer is unable to pay all or a portion of the closing amount within 30 days of Closing, rather than a default occurring, a fixed one time penalty mechanism shall apply with the result that the closing payment total shall be increased by 10% to $11,00,000,000 and payment deferred until the earlier date that Buyer becomes publicly traded or 12 months from closing.

[2] 75% of any and all proceeds generated thru the Buyer's sale of securities thru a public listing or any private placement shall go towards repayment of Senior Promissory Notes until 100% repaid, followed by Junior Convertible Transfer Notes.

[3] Profit Share shall begin in 2022 and remain ongoing for 15 consecutive years or until $7.5 billion paid out to ByteDance ('BD'). Profit shall be calculated as net income after taxes paid. Profit Share shall be paid to BD within 90 days from the Within 60 days from the date of completion of TGN annual financial audit, TGN shall provide to BD a calculation of profit share amount due to BD based on the audit and if BD does not request over the subsequent 30 day period  to initiate its  audit right, then within 10 business days from such 30 day period elapsing, TGN shall make payment to BD of the profit from the calculation previously provided for BD's review. BD will have right to audit TGN financials up to 1X every 3 years to ensure accurate profit share occurs (at BD expense)

Ryder B

-$7.5 billion in guaranteed ad/media purchases paid to BD over next 10 years

Year 1-2 optional ad/media purchases , no minimums required

Year 3-6 minimum $2.0 Billion of guarantee due (average $500 million cash paid to BD per year)
(No less then $200 million cash per year)

Year 7-10 minimum $3.0 Billion of guarantee due  (average $750 million cash paid to BD per year)
(No less then $300 million cash per year)

Properties: TGN will have the option to select to purchase the ad/media across any BD web or mobile ad platforms which BD offers to other ad buyers

Rates:   TGN will receive market rate cpm rates (based on actual cpm rates BD has charged top 20 ad buyers (taking average cpm paid by each ad/unit buyer for the inventory TGN purchase) over previous 90 or 180 days (which ever rate is lower)

Payment Terms:
-For media/advertising purchased in a given month from BD, TGN will receive n/90 payment terms

Ryder C

$5.0 billion in prepaid advertising credits good for 15 years, fully transferable

Properties: BD will receive the prepaid advertising credits to be used on any of TGN owned website or app properties.

Rates: BD will receive market rate cpm rates (based on actual cpm rates TGN has charged top 20 ad buyers (taking average cpm paid by each ad/unit buyer for the inventory BD elects to use) over previous 90 or 180 days (which ever rate is lower)

Payment Terms:
-For media/advertising used, TGN will each month calculate the amount of prepaid advertising that BD elected to make use of and reduce the amount of outstanding prepaid advertising credit and provide an update to BD of its remaining amount of ad credit every 90 days.
-Fully transferrable, so BD can transfer portions to affiliates, partners, and new companies it makes cash invests in and ask these companies to give BD equity in exchange for the $value of prepaid advertising it transfers.

Limits: - In year 1-3, Maximum of $100 million per year of prepaid advertising credit can be used
In year 4-6, Maximum of $300 million per year of prepaid ad credit can be used, In year 7-10, $500 million per year can be used, years 11-15, $750 million per year can be used.

RYDER D

( D)  -$5.5 billion worth of employee stock options (vesting over 5 year term, 50% issuable to employees transferring employment fulltime to TGN & 50% issuable to BD non-transferring employees providing part time employment services or consulting services with current $55 billion valuation strike/exercise price)

Ryder E

( C)  -$4.0 billion liabilities assumed (shall include combination of leases, class action settlements, government fines)

| Liability or Potential Liability | Estimated Range | TimeFrame |
|---|---|---|
| 1.  office leases | $500m - | |
| 2.  transferring employee contracts | $250m | |
| 3.  class action cases | $2.0B- | |
| 4.  government fines/remediation | $900m | |
| 5.  cloud/streaming/bandwidth agreements | $250m | |
| 6.  Non-transferrable license issue | $100m | |
| 7. | | |
| 8. | | |
| Total Estimated: | $4.0 Biilion | |

By month 36 from closing, TGN shall provide to Seller a detailed list of actual amounts It has paid and amounts it expects to pay to fully dispose of the assumed actual  liability or Potential liability and the time frame of such future payments. This total shall be the "benchmark  calculation". Seller shall have the right to audit such items and payments and the parties agree to employ a third party to review and conclude if it is appropriate to modify any estimated remaining future payment calculations presented by Buyer. Any difference remaining from the benchmark calculation when measured against the $4.0 billion in liability assumption will be a credit owing and to be paid to Seller immediately if such amount due would not reduce Buyer's cash on hand by more then 33%, or if such amount due is greater as to cause a reduction by more then 33% of Buyer's cash on hand, then the total due shall  be converted into a new 1% Senior Note due within 36 months.

EXHIBIT 3.0

**SENIOR SECURED PROMISSORY NOTE**

September 24, 2020

THIS SENIOR SECURED PROMISSORY NOTE ("Note") is made and delivered by TikTok Global Network Inc  an Arkansas corporation ("TGN") in favor of  Beijing Byte Dance Telecommunications Co. Ltd., ("Holder").

FOR VALUE RECEIVED, LGI promises to pay to Holder, or order, the principal sum of $5,500,000,000.

1. Interest Rate. Interest shall accrue on the principal balance of this Note outstanding at one percent (1%) per annum. Interest shall be calculated on the basis of a 360-day year and actual days elapsed.

2. Maturity Date. The outstanding principal balance under this Note and all accrued and unpaid interest shall be due and payable in full on the sooner of TGN becoming publicly traded  or September 25, 2022 ("the Maturity Date").

3. Minimum Interest Accrual. However, if the Note is repaid before 12 months have elapsed, Holder shall still be entitled to receive a minimum of one annum of interest.

4. Application of Payments. All payments on this Note shall, at the option of the Holder hereof, be applied first to the payment of accrued interest, then to the outstanding principal balance of this Note.

5. Security. This Note shall rank as the most senior debt held by TGN.

6.  Costs of Collection. TGN agrees to pay all costs of collection when incurred and all costs incurred by the Holder hereof in exercising or preserving any rights or remedies in connection with the enforcement and administration of this Note or following a default by TGN, including but not limited to actual attorney's fees.

8. Construction. This Note shall be governed by and construed in accordance with the laws of the State of Delaware. The titles and captions in this Note are inserted for convenience only and in no way define, limit, extend, or modify the scope of intent of this Secured Promissory Note

9. Partial Invalidity. If any section or provision of this Note is declared invalid or unenforceable by any Court of competent jurisdiction, said determination shall not affect the validity or enforceability of the remaining terms hereof. No such determination in one jurisdiction shall affect any provision of this Note to the extent it is otherwise enforceable under the laws of any other applicable jurisdiction.

10. Prevailing Party Attorney's Fees. In the event any action is brought to enforce any provision of this Agreement, the prevailing party shall be entitled to all costs, expert witness fees, and reasonable attorneys' fees incurred therein.

IN WITNESS WHEREOF, the TGN hereto has caused this agreement to be executed on day and year written above

TikTok Global Network Inc
 By: ___ /s/ ___
Name: Brad Greenspan
Title: President and CEO

## JUNIOR CONVERTIBLE TRANSFER NOTE

September 24, 2020

THIS JUNIOR CONVERTIBLE TRANSFER NOTE ("Note") is made and delivered by TikTok Global Network Inc an Arkansas corporation ("TGN") in favor of Beijing Byte Dance Telecommunications Co. Ltd., ("Holder").

FOR VALUE RECEIVED, TGN promises to pay to Holder, or order, the principal sum of $13,000,000,000.

1. Interest Rate. Interest shall accrue on the principal balance of this Note outstanding at zero percent (0%) per annum. Interest shall be calculated on the basis of a 360-day year and actual days elapsed.

2. Maturity Date. The outstanding principal balance under this Note and all accrued and unpaid interest shall be due and payable in full on the sooner of TGN becoming publicly traded or September 25, 2025 ("the Maturity Date").

3. Application of Payments. All payments on this Note shall, at the option of the Holder hereof, be applied first to the payment of accrued interest, then to the outstanding principal balance of this Note.

4. Security. This Note shall rank junior to the Senior Note debt held by TGN.

5. Costs of Collection. TGN agrees to pay all costs of collection when incurred and all costs incurred by the Holder hereof in exercising or preserving any rights or remedies in connection with enforcement and administration of this Note or following a default by TGN, including actual attorney's fees.

6. Construction. This Note shall be governed by and construed in accordance with the laws of the State of Delaware. The titles and captions in this Note are inserted for convenience only and in no way define, limit, extend, or modify the scope of intent of this Secured Promissory Note

7. Partial Invalidity. If any section or provision of this Note is declared invalid or unenforceable by any Court of competent jurisdiction, said determination shall not affect the validity or enforceability of the remaining terms hereof. No such determination in one jurisdiction shall affect any provision of this Note to the extent it is otherwise enforceable under the laws of any other applicable jurisdiction.

8. Prevailing Party Attorney's Fees. In the event any action is brought to enforce any provision of this Agreement, the prevailing party shall be entitled to all costs, expert witness fees, and reasonable attorneys' fees incurred therein.

9. At option of Holder and upon 30 days notice, portions or all of the Junior Convertible Transfer Note (JCT) can be transferred to and converted into equity issued to former or current ByteDance shareholders or other entities that CFIUS does not object to. The JCT will convert pro rata into a maximum aggregate 21.02% ownership with no individual converting shareholder owning more then 4.9% ownership of TGN.

IN WITNESS WHEREOF, TGN hereto has caused this agreement to be executed on day and year written above

TikTok Global Network Inc
 By: ___ /s/ ___
Name: Brad Greenspan
Title: President and CEO

38

EXHIBIT 5.2

---------- Original Message ----------
From: Brad Greenspan <bgreenspan@tiktokglobalnetwork.com>
To: "cfius@treasury.gov" <cfius@treasury.gov>, "cfius.cms@treasury.gov"
<cfius.cms@treasury.gov>
Cc: "globalmedia@bytedance.com" <globalmedia@bytedance.com>,
"yiming.zhang@bytedance.com" <yiming.zhang@bytedance.com>
Date: 09/09/2020 2:29 PM
Subject: Sec. 2.(d)(i) notification


ATTN: CFIUS
Cc: Mr. Yiming Zhang, CEO ByteDance Ltd

Under Sec. 2.(d)(i), In regards to the U.S. Presidential E.O. Issued on: August 14, 2020 Under
section 721 of the Defense Production Act of 1950, as amended (section 721), 50 U.S.C. 4565
Order Regarding the Acquisition of Musical.ly by ByteDance Ltd